Filed 10/30/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HALEY COLOMBO et al., | D062342 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2007-00077350-CU-PO-CTL) |
| BRP US INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge. Affirmed.

Haight Brown & Bonesteel, Jule S. Zeman, William O. Martin, Jr., Chandra Moore and Blythe Golay for Defendants and Appellants.

Smith, Steiner, Vanderpool & Wax, Ann M. Smith, Kathryn A. Schultz; Tosdal Law Firm and Thomas Tosdal for Plaintiffs and Respondents.

Defendants and appellants Bombardier Recreational Products, Inc. and BRP US Inc. (collectively BRP) appeal a jury verdict in favor of plaintiffs and respondents Haley Colombo and Jessica Slagel (hereafter referred to individually by first name or

collectively as plaintiffs). Because plaintiffs were not wearing a wetsuit bottom or similar protective clothing, Haley sustained serious and permanent injury to her rectum and Jessica to her vagina when, because of operator negligence, they fell off the back of a three-passenger watercraft manufactured by BRP, model GFI 4-TEC. Once in the water, Haley and Jessica were both injured when the powerful jet thrust from the watercraft ripped their flesh.

The jury found the owner of the personal watercraft (PWC), Robert Adamson dba Mission Bay Jet Sports (store; collectively Adamson), its operator and store employee, Brett Kohl (Kohl), and BRP each one-third liable. The jury also awarded punitive damages against BRP, finding its conduct manifested a reckless or callous disregard for plaintiffs' rights and safety.

On appeal, BRP contends the evidence in the record is insufficient to support the jury's causation and punitive damages findings, made under federal maritime common law. In the alternative, it contends the trial court erred when it refused, under this same law, to reduce the amount of punitive damages awarded each plaintiff to equal their respective compensatory damages awards; admitted evidence that, at the time of plaintiffs' accident, BRP had notice of previous claims of orifice injuries to passengers but excluded evidence proffered by BRP to show the causes of the previous claims allegedly were not substantially similar to plaintiffs' accident; and made a series of other rulings that BRP alleges amounted to a denial of a fair trial.

As we explain, we reject each of these contentions and affirm the judgment.

2

FACTUAL AND PROCEDURAL BACKGROUND[1]

In late July 2007, then 16-year-old Haley and her older sister, Megan, visited San Diego to help their sister, Chelsea, move. Haley invited her longtime friend, Jessica, to come along as the group also hoped to go "jet-skiing" in Mission Bay.[2] Before the accident, Haley had never been on a PWC. Jessica had ridden on and operated a PWC a few times and told Haley it was fun.

Kohl—the operator of the BRP watercraft involved in the accident (hereafter sometimes subject PWC)—was the roommate of Chelsea's boyfriend. As a "reward" for helping Chelsea, Chelsea's boyfriend made arrangements for the group to meet Kohl at the store and then go to Mission Bay where they could ride the BRP PWC's.

At Mission Bay, Kohl and Chelsea's boyfriend unloaded two PWC's from a trailer while Haley and Jessica waited on the shore. Haley and Jessica each wore a two-piece bathing suit. Nobody in the group, including the operators of the PWC's, wore a wetsuit

---

[1] Certain portions of the facts and procedural history are discussed *post* in connection with specific issues raised by BRP. We note that BRP's recitation of the "facts" in its opening brief, which begins after a 14-page introduction/summary of argument, is in large measure a rehash of that summary, as it fails to discuss all "significant facts" included in the record and instead addresses myriad evidentiary rulings made by the trial court that it contends were in error. (See Cal. Rules of Court, rule 8.204(a)(2)(C); *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) BRP's failure to provide a summary of all significant facts in its opening brief is concerning given that it attacks the sufficiency of the evidence to support portions of the jury's verdict. As a result, a substantial portion of this summary is derived from this court's own review of the voluminous appellate record.

[2] A "jet ski" is a type of "personal water craft." (See *Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 759, fn. 3 [noting a "personal watercraft is a small jet-propelled vessel" and noting the "sport of riding a personal watercraft is referred to as jet skiing"].) BRP's brand name for its watercraft is "Sea-Doo."

bottom or similar protective clothing. After putting on life jackets, Haley and Jessica waded into the water to meet Kohl. When Haley and Jessica boarded the subject PWC from the back, Kohl already was sitting in the "driver's seat." Kohl did not give them any instructions, safety or otherwise, about riding on the subject PWC.

Haley testified she had no plans that day to operate the subject PWC but was only going to ride as a passenger. In addition, she did not know how the PWC moved through the water, including how fast the water exited the jet-thrust nozzle located underneath the PWC, as it accelerated from a stopped position.

Haley also testified she did not see the "printed material" on the label located under the handlebars on the console of the subject PWC, which included the word "WARNING"; provided that severe injuries to "body cavities" can occur "as a result of falling into water or being near [the] jet thrust nozzle"; and provided that "[n]ormal swimwear does not adequately protect against forceful water entry into lower body opening(s) of males or females," and, thus, "[a]ll riders *must* wear a wet suit bottom or clothing that provides equivalent protection" (hereafter sometimes subject warning). (Italics added.)

According to Haley, if this information had been placed on the back of the subject PWC where it could be seen by a passenger, she would have read and paid attention to it and either would not have ridden on the PWC or would have obtained a wetsuit bottom or similar protective clothing before riding. Haley also testified Kohl did not tell her or

4

Jessica they needed to wear protective clothing to reduce or eliminate the risk of orifice injury.

Haley testified she and Jessica initially were having fun riding as passengers on the subject PWC. Haley sat directly behind Kohl and Jessica behind Haley. However, at some point, Kohl made a sharp turn, causing both girls to fall off the side of the subject PWC into the water. Haley felt Kohl was intentionally trying to throw them off to "show[] off." Although not hurt, Haley said hitting the water "stung." Both she and Jessica told Kohl they did not like being thrown off the subject PWC. When they reboarded the subject PWC, Jessica sat behind Kohl and Haley behind Jessica.

Without warning, Haley next felt a "really strong force just pull [her] back off the back of the jet ski with [her] legs open. And before [she] knew it, [she] had hit the water and had a sharp pain in [her] rectum, like someone stabbing [her] with a knife." Haley put her hand into her bathing suit bottom and pulled out "a ball of flesh." Haley also saw Jessica in the water, crying. Megan and Chelsea's boyfriend, who had been riding nearby on the other PWC, came to their assistance. As she rode back to the shoreline, Haley testified she was bleeding profusely. Once at the shoreline, Haley saw blood running down Jessica's legs.

An ambulance met Haley and Jessica and transported them to the emergency room. Haley had surgery to repair her external and internal anal sphincter muscles, which had been severed by the jet stream from the jet-thrust nozzle of the subject PWC. Haley wore a colostomy bag while she healed, including at school, until it was surgically

5

removed about four months after the accident. At the time of trial, Haley continued to experience issues with anal control and leakage, which made her feel "isolated," "different" and "ruined."

Jessica testified she was 17 years old and entering her senior year in high school when the accident occurred. About a month earlier, Jessica had operated a PWC while vacationing in Hawaii with her family. On that occasion, Jessica was not told she needed to wear protective clothing before operating the PWC, and neither Jessica nor her family members wore such clothing before boarding the PWC. Jessica could not recall the manufacturer of the PWC she rode in Hawaii.

Jessica testified she also rode on and operated a PWC when she was 16, while visiting a relative in Florida. She also could not remember the name of the manufacturer of the PWC she rode in Florida but recalled her relative rented it at the beach. Jessica also did not receive any instructions then regarding the need to wear protective clothing before boarding the PWC nor did she wear any such clothing.

Jessica testified that, on the date of the accident, she and Haley helped Chelsea and then drove to the store, where they waited in the car. Afterwards, they drove to Mission Bay and watched from the shoreline while the two PWC's were put into the water. Jessica put on a life vest and, along with Haley, waded waist-deep into the water where they were met by Kohl.

Although Jessica had operated a PWC before, she testified she did not know anything about the jet-thrust nozzle or how the watercraft was propelled through the

6

water. She also did not see the subject warning on the console of the subject PWC because Kohl already was seated in the operator's seat, and both she and Haley boarded from the back.

Jessica testified Kohl did not tell her she needed to wear protective clothing to ride on the PWC, and she did not know BRP included such a warning on the console of the PWC. Like Haley, Jessica told the jury if BRP had included such a warning or the word "danger" where she could see it before boarding the PWC, she would have paid attention to that warning and either acquired protective clothing or not ridden on the PWC.

Jessica testified she initially sat behind Haley. Jessica put her arms around Haley's waist to hold on and could see Haley's arms around Kohl's waist. Jessica testified she and Haley were initially having fun until Kohl made a sharp turn, causing both girls to fall into the water. Both she and Haley told Kohl not to throw them into the water. In response, Kohl said, "I promise I won't."

After the girls reboarded the subject PWC, Jessica felt "like a push, a force, pushing [her] off the back of the jet ski." She landed in the water with her legs spread and immediately felt pain in her vagina. Jessica said she felt like she had been "punched" and had "hit concrete." Megan and Chelsea's boyfriend helped Jessica onto their PWC because Jessica refused to ride back to shore with Kohl. At that point, Jessica said the blood from underneath her bathing suit flowed like a "faucet" and filled up the foot wells of the PWC.

7

At the hospital, Jessica had surgery to repair her vagina and the tear from her "rectum to [her] vagina." At the time of trial, Jessica testified that she still experienced some pain and discomfort, that she occasionally took a stool softener, and that, if she decides to have children some day, she likely would have to deliver by cesarean section.

Kohl testified that he worked at the store for several months before the accident. Before being hired by Adamson, Kohl had operated PWC's for many years. Once hired, Kohl rode the PWC's "all the time." Although customers renting a PWC were required by Adamson to complete certain "paperwork," Kohl stated nothing in the paperwork warned that a wetsuit bottom or its equivalent must be worn to reduce or eliminate the risk of orifice injuries from a PWC's jet-thrust nozzle. Kohl also stated that he never discussed the need to wear such clothing with a customer and never showed a customer the owner's/operator's guide for any of the BRP PWC's rented by the store, which also included such a warning.

Kohl stated that the store did not offer wetsuits or similar protective clothing for sale to, or rental by, customers operating or riding on a PWC and that he only wore such clothing on a couple of occasions, and then not for protection, but instead when the water was cold or when he was taking a PWC into the open ocean. Kohl also stated that Adamson never brought to his attention the need for an operator or passenger of a PWC to wear protective clothing to prevent or reduce the risk of orifice injury from the jet-thrust nozzle.

8

On the day of the accident, Kohl testified he was in charge of the store because Adamson was on vacation. Kohl agreed to take the two PWC's out after business hours at the request of his roommate, Chelsea's boyfriend. Kohl said the group came to the store and then they all went to Mission Bay. Kohl provided each member of the group with a life jacket from the store.

After Haley and Jessica boarded the subject PWC, Kohl stated he started out slowly because of the "no-wake zone." He then sped up and got the subject PWC on a "plane" as they headed to an area in Mission Bay designed only for PWC's. As he operated the PWC at about 25 to 35 miles per hour, Kohl thought Haley and Jessica were having fun. At some point, he made a sharp turn, and Haley and Jessica fell into the water. They told Kohl not to throw them off again.

After plaintiffs reboarded the subject PWC, Kohl testified one of them asked to be taken back to shore. He next applied full throttle in order to get the subject PWC on a plane, but he felt a pull and saw plaintiffs had fallen back into the water, this time directly behind the PWC. Kohl testified this was typically how he accelerated a PWC once he was stopped in the water.

When Haley got back on board the subject PWC, Kohl saw she was bleeding. Although Kohl generally understood water from the jet of the PWC came out fast, he did not know it had the capacity to tear human flesh;[3] thus, he had no idea how Haley and

_____

[3]      Plaintiffs' biomechanical expert testified that, based on BRP's own simulated testing when it sought to recreate the accident involving Haley and Jessica, the subject watercraft's jet thrust nozzle produced about 800 pounds of force, or about 55 pounds per square inch, at or near the time plaintiffs would have fallen off the back of the subject

9

Jessica had been injured when they fell off the back of the subject PWC. He stated this was the first time he had been involved in an accident involving a PWC and, as far as he knew, was also the first involving a PWC rented from the store.

Kohl testified Adamson never took him out on the water to show him how to operate the PWC safely nor did Adamson give Kohl the owner's/operator's guide containing the safety instructions of, or advise him to read the warning label on, the subject PWC. Kohl said he was aware of the warning label on the subject PWC but did not actually read it until *after* the accident.

Plaintiffs sued Adamson, Kohl and BRP. In response, Adamson brought an action in federal court under the Limitation of Liability Act (46 U.S.C. § 30501 et seq.; hereafter LOLA or the Act), seeking either exoneration or limitation of his liability equal to the value of the subject PWC, which was $6,005. During the LOLA proceedings, the instant action was stayed.

The record shows the Ninth Circuit Court of Appeals determined the accident in this case conferred admiralty jurisdiction under the LOLA. The district court thereafter conducted a bench trial that included witness and expert testimony, found that the Act did not apply either to exonerate Adamson or limit his liability to the value of the subject PWC, and lifted the stay.

The district court specifically found Haley and Jessica had satisfied their burden "of showing that their injuries were caused in the first instance by Kohl's failure to warn

PWC. The expert further testified that some research suggested that about five pounds per square inch of liquid is enough to cause a rectum to rupture.

10

[them] of the risks associated with orifice injuries," which failure, it further noted, was "directly attributable to [Adamson] because [he] failed to adequately train and instruct [his] employees in the safe operation of PWCs, including warning of the risk of orifice injury and the need for protective clothing. Because [Adamson] negligently failed to instruct Kohl and other employees about the risk of orifice injury and the need for protective clothing, it was reasonably foreseeable that guest passengers, such as [Haley and Jessica], would be unaware of the risk of orifice injury and, therefore, subject to such injury."

The district court also found Adamson failed to show under the LOLA that he lacked knowledge of the act of negligence causing the accident. In regard to this finding, the district court noted Adamson had a "non-delegable duty to train, instruct, and supervise [his] employees in the safe operation of PWCs, and to ensure that [his] employees communicated those safe practices to all those whose presence on board was reasonably foreseeable."

Once the stay was lifted, this matter proceeded to trial, which included the testimony of at least 20 witnesses and a court-supervised visit by the jury to Mission Bay to inspect the subject PWC both in and out of the water. The jury subsequently returned its verdict, finding that the subject PWC was defective "because of inadequate warnings" and that this defect was a "substantial factor in causing harm" to both Haley and Jessica. The jury awarded Haley about $3.385 million in damages, which included past and future medical expenses and past and future noneconomic losses, and awarded Jessica about

11

$1.063 million in similar damages. The jury also found Adamson, Kohl and BRP each one-third responsible for the harm suffered by plaintiffs.

Finally, the jury found under federal maritime common law that BRP's conduct showed a "reckless or callous disregard for the rights of others" (sometimes hereafter punitive damages finding). As a result, after hearing additional testimony and evidence of BRP's financial condition, the jury returned a second verdict in the punitive damages phase of the trial, awarding Haley and Jessica each $1.5 million. The judgment entered also included an award of prejudgment interest.

## DISCUSSION

A. Causation[4]

1. *Guiding Principles*

It is axiomatic that when, as in the instant case, an appellant challenges the sufficiency of the evidence to support a jury's verdict, we apply the substantial evidence standard of review. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957 (*Cahill*).) "'"[T]he power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.] . . . An

---

4    In its briefing, BRP initially contends there is insufficient evidence in the record to support the jury's punitive damages finding. We note, however, that *if* there is insufficient evidence to support the jury's finding BRP was a substantial factor in causing plaintiffs' harm, as BRP also contends, we need not reach the punitive damages issue(s).

appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact." (*Id.* at pp. 957–958.)

"This standard, however, does not require us to blindly seize any evidence in support of the trier of fact's findings in order to affirm the judgment. [Citation.] Rather, it compels us to determine whether a reasonable trier of fact could have found for the respondent based on the entire record. [Citation.] This is so because 'substantial' is not synonymous with 'any' evidence, but refers to the quality, not the quantity of the evidence. [Citation.] So, after reviewing the whole record, we must determine whether there exists substantial evidence, which is evidence of ponderable legal significance that is reasonable, credible and of solid value, supporting the challenged findings of the trier of fact. [Citation.] While substantial evidence may inevitably consist of inferences, they must be the result of logic and reason emanating from the evidence and not mere speculation or conjecture. [Citation.] It must actually be substantial proof of the essentials the law requires in the particular case. [Citation.]" (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282-1283 (*Quigley*).)

The instructions to the jury included Judicial Council of California Civil Jury Instruction (CACI) No. 430,[5] which defines "substantial factor" for purposes of causation

---

5    The parties agree that the instant case is governed by federal maritime common law, which recognizes the law of products liability and "which is informed by the American Law Institute's Restatement of Torts." (*Oswalt v. Resolute Industries, Inc.* (9th Cir. 2011) 642 F.3d 856, 860 (*Oswalt*) [noting a party's product liability claims "are controlled by the federal common law of maritime torts"].) Nonetheless, under the "savings to suitors" clause (28 U.S.C. § 1333(1) [providing that a district court shall have jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled"]), "[e]ven where

13

as follows: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*) [noting a manufacturer is liable if its product was a proximate cause of the plaintiff's injury].)

The jury was also instructed with modified CACI No. 431, regarding "multiple causes" for purposes of causation: "A person's fault may combine with another factor to cause harm. If you find that BRP's fault was a substantial factor in causing Haley Colombo's and Jessica Slagel's harm, then BRP is responsible for the harm. BRP cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing Haley Colombo's and Jessica Slagel's harm."

The jury was also instructed with respect to when a product is defective because of an inadequate warning: "A product is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings to foreseeable

admiralty jurisdiction has been invoked, "'state law may . . . supplement federal maritime law,'" but it ""'may not, however, conflict with federal maritime law, as it would be redefining the requirements or limits of a remedy available at admiralty.'"" (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1517-1518 (*Brandwein*); see *Continental Casualty Co. v. Anderson Excavating & Wrecking Co.* (7th Cir. 1999) 189 F.3d 512, 519 [noting a court "sitting in admiralty can, by analogy to the practice of the federal courts in regard to federal common law (which is to say nonadmiralty federal judge-made law), borrow the law of a state or a foreign country to resolve a dispute that had come into court under the admiralty jurisdiction, especially when dealing with a subject traditionally regulated by the states, such as insurance"].)

14

users of the product by the seller or other distributor and the omission of the instructions or warnings renders the product not reasonably safe for the product's foreseeable users. [¶] Haley Colombo and Jessica Slagel have the burden to show more likely than not the 2007 GTI [watercraft manufactured by BRP] was defective because of inadequate warnings or instructions and the inadequate warnings or instructions were a substantial factor in causing them harm."

Finally, the jury was instructed regarding when a product warning is required: "Whether or not many persons would, when warned, decide to use the product, warnings are required to protect the interests of those reasonably foreseeable users or consumers who would, based on their own reasonable assessments of the risks and benefits, decline to use the product. The omission of such warnings renders the product not reasonably safe for the product's foreseeable users."

As noted by the above jury instructions, "'[i]n the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury.'" (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 696.) "'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.] Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault." (*Bockrath v. Aldrich Chemical Co.*

15

(1999) 21 Cal.4th 71, 79.)  "A plaintiff need not establish that a defendant's product was the sole potential proximate cause of injury, but only that the defendant's conduct substantially contributed to the injury and the circumstances make it just to hold the defendant responsible for the consequences of the accident.  [Citation.]"  (*Bunch v. Hoffinger Industries, Inc.* (2004) 123 Cal.App.4th 1278, 1302 (*Bunch*).)

BRP does not contend any of these instructions were improper.  It also does not contend its subject warning was adequate, at least for purposes of causation.

Instead, it argues there is insufficient evidence in the record to support the finding of the jury that its inadequate warning about the hidden danger of the jet-thrust nozzle and the need for passengers such as plaintiffs to wear protective clothing to prevent or reduce the risk of orifice injury was a substantial factor in causing plaintiffs' harm.  Specifically, it contends plaintiffs' own "self-serving testimony," that on the date of the accident they would have heeded such a warning had they seen it and either not ridden the subject PWC or obtained protective clothing before riding, was inadmissible.  BRP also contends the testimony proffered by one of plaintiffs' experts to establish causation was inadmissible.

2.  *Analysis*

The jury instructions (which, as noted, BRP does not challenge on appeal) expressly provide that the trier of fact could consider plaintiffs' testimony in determining whether they satisfied their burden to show the subject PWC was "defective because of inadequate warnings or instructions" and, if so, whether the "inadequate warnings or

16

instructions were a substantial factor in causing them harm." It is beyond dispute that Haley and Jessica were both "consumers, who would, based on their *own* reasonable assessments of the risks and benefits, decline to use the product" (italics added) *if* they were given a warning similar to the subject warning located on the console of the PWC, inasmuch as both testified to this very fact.

BRP did *not* challenge this evidence at trial. (See *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563-564 [noting the failure to object to evidence in the trial court generally results in the forfeiture of any appellate claim that such evidence was wrongfully admitted].) In any event, we conclude this evidence was properly admitted, as it is of reasonable, credible and solid value and supports the finding of a reasonable jury (see *Quigley*, *supra*, 214 Cal.App.4th at pp. 1282-1283) that BRP's conduct in failing to give plaintiffs a warning similar to the one given to the operator was a substantial factor in causing their harm. (See *Bunch*, *supra*, 123 Cal.App.4th at p. 1304 [concluding the testimony of an 11-year-old victim that she would not have dove into four feet of water and broken her neck if the warning on the pool had been adequate, along with the testimony of two of her experts, was sufficient evidence to show the "lack of a persuasive label outlining the consequences of diving into the pool was a substantial factor in causing the injury"].)

Moreover, product safety and warnings expert William Kitzes testified on behalf of plaintiffs that the subject warning located on the console of the PWC was inadequate because plaintiffs did not and could not see it because Kohl was already seated in the

17

operator seat when they initially boarded (from shore), and later reboarded (after they fell in the water), the watercraft. He further testified that an additional written warning, which would have been "highly inexpensive" to create and/or affix, should have been located at the rear or back of the subject PWC so that it was "readily visible" to passengers like Haley and Jessica.

Kitzes opined that BRP's inadequate warning to PWC passengers of the risk of orifice injury from the powerful jet-thrust nozzle was a substantial factor in causing the injuries of plaintiffs, relying on the testimony of both Haley and Jessica that if they had been warned and instructed "to wear a wetsuit or heavy protective clothing[,] . . . [they] would have either worn such clothing or not gotten on the [subject PWC]."

When asked whether others beside Haley and Jessica would have heeded an adequate warning *if* in fact BRP had made one to PWC passengers, Kitzes testified: "I can't say that every single person would react in a certain way. I can say that -- that the literature and the studies have shown that the better the information is, the more likely that you will be able to . . . get someone to follow it, to comply with it, if they understand it and they need it. Now I can't say that everybody will do that, because I don't know. But based on the facts that were in the testimony, it seems apparent that had they [i.e., Haley and Jessica] been given that kind of warning, that they would not have endangered themselves."

We conclude that Kitzes's testimony is additional, substantial evidence supporting the finding of a reasonable jury (see *Quigley*, *supra*, 214 Cal.App.4th at pp. 1282-1283)

18

that BRP's warning to passengers was inadequate, thus making the subject PWC defective in design, *and* that this design defect was a substantial factor in causing plaintiffs' harm. Although BRP in its opening brief generally attacks (without citation to the record) the substance of his testimony, contending Kitzes allegedly conceded that a differently worded or placed warning label allegedly would not have prevented the injuries to the plaintiffs, we conclude that at most such testimony, when considered in its proper context, created a conflict in the evidence that the jury resolved in favor of plaintiffs. (See *Bunch*, *supra*, 123 Cal.App.4th at p. 1304 [concluding expert testimony that warning label on above-ground pool was inadequate for children between the ages of seven and 12 because it "failed to spell out any consequences of diving into shallow water" and noting that our Supreme Court has pointed out that even "'"a very minor force that does cause harm is a substantial factor"'"]; see also *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [observing that when "considering a claim of insufficient evidence on appeal, we do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment"].)

19

B. Punitive Damages[6]

1. *Federal Maritime Common Law*

As the parties themselves recognize, punitive damages are allowable under federal maritime law and are awarded under a preponderance of the evidence standard of proof.[7] (See *In re Exxon Valdez* (9th Cir. 2001) 270 F.3d 1215, 1226, 1232 [rejecting the clear and convincing standard in favor of the preponderance of the evidence standard of proof in concluding commercial fishermen were entitled to punitive damages from defendant Exxon].)

Moreover, the parties also recognize that an award of punitive damages under federal maritime law can be based on mere reckless conduct or gross negligence.[8] (See, e.g., *Exxon Shipping Co. v. Baker* (2008) 554 U.S. 471, 493 (*Exxon*) [explaining an award of punitive damages in federal maritime cases may be based on mere reckless

---

[6] As noted, BRP challenged myriad evidentiary rulings made by the trial court. We address those rulings *post* in a separate section of our discussion, following somewhat the sequence of issues raised by BRP in its opening brief. To the extent we rely on evidence BRP contends was inadmissible, as we discuss *post*, it is because we conclude such evidence was in fact admissible.

[7] BRP in its reply brief wisely *withdrew* its contention that a clear and convincing evidentiary standard of proof applied to the punitive damages awarded Haley and Jessica. (See Reply Brief, p. 11, fn. 14.) In contrast, California requires punitive damages to be supported by "clear and convincing" evidence. (See Civ. Code, § 3294, subd. (a).)

[8] In contrast, California does *not* recognize punitive damages for conduct that is grossly negligent or reckless. (See *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 899–900 [noting "ordinarily, routine negligent or even reckless disobedience of [the] laws would not justify an award of punitive damages"]; *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 828 [noting that punitive damages should be awarded "only in the most outrageous cases" and noting that to be awarded, the "act complained of must not only be willful, in the sense of intentional, but it must be accompanied by some aggravating circumstance amounting to malice"].)

conduct that is worse than negligence, but "is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it"]; *Miles v. Melrose* (5th Cir. 1989) 882 F.2d 976, 989 [noting to award punitive damages a defendant must be guilty of "gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct"].)

The *Exxon* court relied on the definition of recklessness from the Restatement Second of Torts[9] when it concluded defendant Exxon was liable for punitive damages for maritime property damage: "'Recklessness may consist of either of two different types of conduct.  In one the actor knows, or has reason to know . . . of facts which create a high degree of risk of . . . harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk.  In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.'"  (*Exxon*, *supra*, 554 U.S. at p. 493, quoting Rest.2d Torts, § 500, com. a); see Rest.3d Torts, Phys. & Emot. Harm, § 2 ["A person acts recklessly in engaging in conduct if: (a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and (b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to risk."].)

9    As discussed *ante* in footnote 5, the Restatement of Torts defines the contours of federal maritime law.  (See *Oswalt*, *supra*, 642 F.3d at p. 860.)

21

2. *Jury Instructions*[10]

The jury was instructed as follows regarding the conduct necessary to sustain, and/or the standard of proof for the imposition of, an award of punitive damages under federal maritime law:

"**Conduct Manifesting A Reckless or Callous Disregard For the Rights of Others, Gross Negligence, Actual Malice or Criminal Indifference**

"If you decide BRP was a substantial factor in bringing about harm to Haley Colombo and/or Jessica Slagel, then you must also decide whether BRP's conduct manifests reckless or callous disregard for the rights of others, or shows gross negligence or actual malice or criminal indifference.

"'Reckless or callous disregard' is conduct demonstrated by one who knows or has reason to know of facts which create a high degree of risk of harm to another, and proceeds to act, or fails to act, in conscious disregard of or indifference to that risk.

"'Malice' means an intent to cause injury or despicable conduct done with a willful and knowing disregard of the rights or safety of another.  A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his/her/its conduct and deliberately fails to avoid those consequences.

_____

[10]    Given there was no challenge by either party to the punitive damages jury instructions, we have no need to address specifically whether the instructions were consistent with federal maritime common law.

22

"'Gross negligence' is the lack of any care or an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. A person can be grossly negligent by acting or by failing to act.

"Plaintiffs Haley Colombo and Jessica Slagel each bear the burden of proving that it is more likely than not that BRP's conduct manifested a reckless or callous disregard for the rights of others, gross negligence, actual malice, or criminal indifference."

3. *Substantial Evidence Standard of Review*

Finally, the parties agree that we review the jury's punitive damages findings for substantial evidence. (See *Schlessinger v. Holland America* (2004) 120 Cal.App.4th 552, 558, fn. 3 [noting that "even if federal law governs issues of substance with respect to a claim pending in state court, 'the law of the state controls on matters of practice and procedure'" and noting that, as such, "rules defining the standard of appellate review are, in general, procedural not substantive"].)

Under this standard, we do not reweigh the credibility of witnesses or resolve conflicts in the evidence, but instead "must view the conflicting evidence regarding punitive damages in the light most favorable to the judgment pursuant to the familiar substantial evidence rule. [Citation.]" (See *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 622 (*Rufo*); see also *Cahill*, *supra*, 194 Cal.App.4th at p. 957.)

4. *Analysis*

We conclude under a preponderance standard of proof that the record contains sufficient evidence to support the jury's punitive damages finding. Indeed, the product

23

safety manager of BRP, Shawn Eaves Le Blanc, testified in deposition (which was played for the jury) that at the time of his deposition, he already had testified on behalf of BRP in nine or 10 cases of orifice injuries to passengers riding on BRP watercraft; that before plaintiffs were injured, BRP knew passengers could fall off the back of a PWC and be severely injured by the jet-thrust if they were not wearing protective clothing; and that, as a result of such knowledge, BRP warned against rapid acceleration of the watercraft, warned of the need to wear the proper protective clothing and made other product improvements in an attempt to keep passengers from falling off the back of its watercraft.

Le Blanc also testified that BRP considered placing additional written warning labels in locations other than under the front console of its watercraft. BRP ultimately refrained from doing so, however, despite its knowledge that a passenger boarding from the back of a watercraft while the operator was seated might not see the warning. Le Blanc testified BRP decided not to place additional written warnings on its watercraft, including on the back where the warning could be readily seen by passengers, because BRP wanted to avoid what he confusingly referred to as a "dilution effect" by "having more panels or warning labels about the same subject."

LeBlanc admitted the risk of not wearing a wetsuit bottom or other protective clothing to prevent or reduce orifice injuries was not readily apparent to anyone walking up to use the watercraft. As such, Le Blanc agreed that a warning label was necessary to convey the risk and possible consequences to the passengers. He stated that BRP wanted the label to be visible and understandable.

24

In addition to this evidence, as noted *ante*, product safety and warnings expert Kitzes opined that the location of the subject warning on the front of the PWC console was inadequate to warn passengers of the potential risk of severe injury from the jet-thrust of a PWC and that an additional written warning should have been located at or near the back of the watercraft so it was "readily visible" to passengers like Haley and Jessica who were most in need of such a warning. According to Kitzes, placing an additional warning on the back of a PWC would have been inexpensive and would have obviated BRP's reliance on the operator of a PWC to inform passengers of the potential risks of orifice injury and how to protect themselves from those risks.

Kitzes testified that in or about 1995, BRP officials were aware that Yamaha used three warnings on its PWC's. One warning was located directly under the handlebars of the PWC and stated: "Wear wetsuits to protect against abrasion, hypothermia, and injuries to orifices (rectum and vagina), from impact with the water surface." Immediately above this warning were the additional warnings for the operator regarding the jet stream: "Strong jet streams can be dangerous and can result in injury when directed at body orifices" and "Do not apply throttle when someone is in the water behind the jet nozzle or when a passenger is climbing on."

Finally, Yamaha also placed a warning at the back of the PWC, which stated: "Strong jet streams can be dangerous and can result in injury when directed at body orifices." It further stated, "Wear a wetsuit to protect body" and "Don't board vehicle if operator is applying throttle."

25

In 1999, Yamaha was still using a three-label warning system on its PWC's, with the back label for the passenger stating: "Warning, strong streams of water from the jet nozzle can be dangerous and can result in serious injury when directed at the body orifices (rectum and vagina). Wear a wetsuit to protect body. Do not board if operator is applying throttle."

Kitzes opined that Yamaha's use of three labels to warn of orifice injury showed that just using a console warning, such as that used by BRP, was "not enough to provide the necessary information to both the operator and the passenger, so they [Yamaha] developed two additional labels, which now both include 'rectum and vagina,' both include 'strong streams from the jet nozzle,' and it's a far better analysis and warning" than that used by BRP.

Plaintiffs also offered the expert testimony of Alison Osinski, a recreational water and boating safety expert. Osinski opined that the jet-stream nozzle from a PWC posed a danger of severe injury or possibly death; that most people would not recognize the jet stream as dangerous because it was merely the movement or flow of water, in contrast to a propeller on the back of a boat, which most people would recognize as dangerous; and that because the jet releases water *under* the PWC, it is a hidden danger. She noted that, in her experience, both operators and passengers are unaware of the hazards of "rectal and vaginal blow-outs" from the jet thrust of a PWC.

Osinski testified the operator of a PWC holds on to the watercraft by holding the handlebars. Passengers riding on a PWC, however, either must hold on to a strap, which

could be used by the first passenger sitting directly behind the operator, or to what Osinski called "side hand-holds" and "rear hold" that a second passenger could grab when sitting behind the first passenger. As part of her investigation, Osinski inspected the subject PWC that had been placed in storage following the accident. Based on the location of the strap, Osinski opined that Kohl was actually sitting on the strap when the accident occurred. She further opined that the hand-holds were not available to the first passenger and that a second passenger could use them only if he or she had long enough arms and leaned back slightly. Osinski concluded the hand-holds were inadequate to keep the second passenger on a PWC during "rapid acceleration."

Osinski testified another way for passengers to stay on a PWC was merely to hold on to the person, or the life vest worn by the person, sitting in front of him or her. However, according to Osinski, a novice rider, such as Haley or Jessica, would likely not understand the forces involved when a PWC accelerates and that is why BRP warned operators not to accelerate too quickly. Osinski opined this warning reflected knowledge by BRP that rapid acceleration was a foreseeable use of its products.

Osinski reviewed a safety video of the same PWC model plaintiffs were riding on the date of the accident and found the video never mentioned the risk of rectal and/or vaginal injuries from the jet-thrust nozzle. Osinski observed that the safety video showed some passengers and operators riding the PWC in "regular" swimsuits. Osinski also agreed with Kitzes that passengers boarding a PWC from the water would not see the warning on the console if the operator was seated on the PWC.

27

We conclude the above evidence is substantial and, when viewed under a preponderance standard of proof, supports the finding of a reasonable trier of fact (see *Quigley*, *supra*, 214 Cal.App.4th at pp. 1282-1283) that BRP engaged in conduct that manifested a reckless or callous disregard for the rights of plaintiffs by not adequately warning them of the known and severe risk of orifice injury and how to avoid or reduce that risk.

BRP nonetheless makes a series of contentions in support of its argument the punitive damages finding must be reversed. BRP first contends reversal is required because, although the jury found the warning inadequate, it also found the subject PWC was not otherwise defectively designed. BRP fails to cite any authority to support this contention. In any event, as discussed *ante* federal maritime law encompasses more than one type of product defects, including, as demonstrated by the instant case, *warning defects*. (See Rest.3d Torts, Products Liab., § 1 [noting that "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect"] & § 2 [noting there are three categories of product defect: (1) manufacturing defect; (2) design defect; and (3) *inadequate instructions or warnings*]; see also *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 (*Anderson*) [noting recovery in a "products liability" case is generally permitted for three kinds of defects: manufacturing defects, design defects, and *warning defects* (either an inadequate warning or a failure to warn)].) We thus reject this contention.

28

BRP next contends there is insufficient evidence to support the jury's punitive damages finding because BRP (1) included the subject warning on the front console of the subject PWC, directly beneath the handle bars and in the immediate sight of the operator and (2) "employed teams of experienced professionals to test its vessels for thousands of hours before they were placed in the market." BRP contends this evidence was allegedly uncontroverted by plaintiffs, and, thus, its "conduct was wholly inconsistent with a callous disregard for the safety of others or a similar state of mind."

We reject this contention because, at its core, it requires us to reweigh the evidence and make one or more new findings under the guise of substantial evidence review. This we cannot do; that there was a conflict in the evidence in connection with the awards of punitive damages or even evidence that would support one or more different findings is not the test. Instead, we "must view the conflicting evidence regarding punitive damages in the light most favorable to the judgment pursuant to the familiar substantial evidence rule. [Citation.]" (*Rufo*, *supra*, 86 Cal.App.4th at p. 622; see *Cahill*, *supra*, 194 Cal.App.4th at pp. 958-959.)

BRP next contends the punitive damages finding must be reversed as a matter of law because BRP in fact warned of the specific risk of injury suffered by plaintiffs in this case. BRP relies on a series of cases—none of which appear to apply federal maritime common law—to support this contention. We nonetheless turn to a discussion of the key cases cited by BRP.

29

BRP cites to *Richetta v. Stanley Fastening Systems* (E.D.Pa. 2009) 661 F.Supp.2d 500 (*Richetta*). There, the plaintiff admitted he read the warning in the owner's manual provided by the defendant nail gun manufacturer that the nail gun should be disconnected from the air compressor when not in use, which warning was also included on the nail gun packaging. (*Id.* at p. 514.) Thus, the only basis for the plaintiffs' punitive damages claim in *Richetta* was that the defendant "had notice of injuries resulting from its nail guns' contact trip trigger design, yet [d]efendant did not redesign its nail guns to include a safety switch." (*Ibid.*)

In contrast, plaintiffs neither read the subject warning on the PWC console before they boarded the watercraft nor, more importantly, could they have read it because Kohl was already sitting in the operator's seat and was blocking their view of the only warning on the subject PWC. *Richetta* is therefore analytically inapposite to the present case.

BRP also cites to *Heston v. Taser Int'l., Inc.* (9th Cir. 2011) 431 Fed.Appx. 586, 589 (*Heston*) for the same proposition, to wit: when a manufacturer warns of a specific risk of harm and how to prevent it, the requisite intent to establish punitive damages allegedly is lacking as a matter of law. We note that pursuant to United States Circuit Rules (9th Cir.), rule 36-3, the Ninth Circuit Court of Appeals expressly stated that *Heston* was "not appropriate for publication and is not precedent . . . ." (*Id.* at p. 587, fn. *.) In any event, the jury in *Heston* expressly found the manufacturer of the electroshock weapon used on the victim did not know that prolonged deployment of the weapon could cause cardiac arrest, which finding, according to the Ninth Circuit,

30

demonstrated as a matter of law that the defendant manufacturer did not engage in "'willful or wanton' conduct." (*Id.* at p. 589.)

In contrast, there is no similar finding by a jury that BRP did not actually know *beforehand* of the risk of the orifice injury that plaintiffs suffered from the foreseeable use of its product. To the contrary, Le Blanc testified BRP knew by the late 1990's that passengers were sustaining orifice injuries when they fell off the back of a PWC on acceleration, and BRP knew those injuries could, in his words, be "severe." *Heston*, like *Richetta*, is thus inapposite to the instant case.

Another case cited by BRP for the same proposition is *Dudley v. Bungee Int'l Mfg. Corp.* (4th Cir., Jan. 31, 1996, No. 95-1204) 1996 U.S.App. Lexis 1267 (*Dudley*), a "per curiam" decision that appears in the "Table of Decisions Without Reported Opinions" pursuant to "local rule" 32.1 of the United States Court of Appeals for the Fourth Circuit. Under that local rule, "Citation of this Court's unpublished dispositions issued prior to January 1, 2007 . . . is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case."

However, even considering the merits of *Dudley*, we still conclude it does not support BRP's position. There, the plaintiff was struck in the eye by a "bungee cord" manufactured by defendant. The packaging of the bungee cord warned that if the cord was stretched more than 75 percent of its "stretchable length," the "[s]tress on anchor points is increased many times as the cord approaches its maximum stretch limit, possibly resulting in failure of either fastener and dangerous rebound." (*Dudley*, *supra*, 1996 U.S.

31

App. Lexis 1267 [at p. 10].)  Because it was undisputed that the plaintiff stretched the cord over 75 percent of its stretchable length, the *Dudley* court applied Virginia law, found the defendant exhibited "some care" for the safety of the plaintiff and therefore reversed the award of punitive damages based on a failure to warn theory.  (*Id.* [at p. 15].)

Unlike the situation in *Dudley* where there was no evidence the warning placed on the bag was inadequate or was not seen by the plaintiff, here the jury found the subject warning on the PWC was inadequate.  What's more, the record shows plaintiffs did not see, nor could they have seen, the subject warning.  For these reasons, we conclude *Dudley* does not inform our view in the present case.[11]

BRP also relies on *Richards v. Michelin Tire Corp.* (11th Cir. 1994) 21 F.3d 1048 (*Richards*).  There, the plaintiff attempted to put a 16-inch tire on a tire rim that legibly provided its size was 16.5 inches.  (*Id.* at p. 1051.)  Because of the danger of mismatches (i.e., overinflation of a 16-inch tire on a 16.5-inch rim), the defendant tire manufacturer, at the urging of a car manufacturer, had previously added the following warning on its tires' sidewalls:  "'Mount only on approved 16-inch rims.'"  (*Id.* at p. 1051.)  When the plaintiff was unable to mount the 16-inch tire on the 16.5-inch rim, he and a coworker inserted a tube inside the tire, despite the "'tubeless'" notation on the tire itself and despite three statements on the inner tube that it was "'Not For Use in Radial Tires.'"  (*Ibid.*)  The

---

11    *Dudley* is also distinguishable because, in our view, the risk of injury from over-stretching a bungee cord is somewhat obvious to a user (i.e., a "dangerous rebound"). (See *Dudley*, *supra*, 1996 U.S. App. Lexis 1267 [at p. 10].)  In contrast, as Osinski noted, the risk of orifice injury from the jet-thrust stream located underneath a PWC is not obvious.

32

plaintiff then inflated the tire 10 pounds over its maximum capacity. About 10 seconds later, the tire exploded, permanently injuring the plaintiff. (*Id.* at p. 1052.) Applying Alabama law, the United States Court of Appeals for the Eleventh Circuit reversed the plaintiff's punitive damages award.

Unlike the plaintiff in *Richards*, here there is no evidence that plaintiffs misused the product or otherwise ignored multiple proper *and* effective warnings given by the defendant manufacturer that, if read and followed, would have averted their injuries. We conclude *Richards* is, like the others (including in fn. 23 of BRP's opening brief), is inapposite and offers no guidance on the issue before us arising under maritime law.

Finally, BRP contends that the punitive damages awards must be reversed because the district court in connection with the LOLA proceeding had previously adjudged Adamson and Kohl as the parties responsible for plaintiffs' injuries and because Adamson testified he had read the warning label on the console of the subject PWC and understood from that warning that one of the possible risks of harm was the type of injuries sustained by Haley and Jessica.

First, we note the jury was instructed Adamson and Kohl were "negligent and their negligence was a substantial factor in causing harm" to Haley and Jessica. There is nothing in this instruction suggesting Adamson and Kohl were negligent solely because they allegedly disregarded BRP's safety warning regarding the potential of orifice injuries.[12]

---

[12]    For example, the record also supports a finding that Kohl was "negligent" when he disregarded the warning by BRP and rapidly accelerated the PWC, causing Haley and

33

Second, even *if* Adamson and Kohl were negligent because they failed to warn plaintiffs of orifice injuries and the need to wear protective clothing, we would still conclude that such a finding does not ipso facto mean that BRP as a matter of law could not have engaged in conduct supporting the imposition of punitive damages. As summarized *ante*, we conclude there is sufficient evidence in the record of conduct by BRP for this issue to have been submitted to the jury.

As is evident from our discussion, whether a defendant manufacturer engages in reckless or callous conduct to support imposition of punitive damages under federal maritime law is to be determined by the facts and circumstances of each case. As is further evident from our discussion, we conclude that, on this record, plaintiffs proffered sufficient evidence for this issue to go to the jury, despite the existence of other evidence, including evidence presented by BRP that *may* have supported a contrary finding by the jury. (See *Cahill*, *supra*, 194 Cal.App.4th at pp. 958-959; *Rufo*, *supra*, 86 Cal.App.4th at p. 622.)

C.  Limitation of Punitive Damages Awarded under Federal Maritime Law

BRP alternatively contends that under maritime common law the amount of punitive damages awarded each plaintiff can be no greater than the amount of each of their compensatory damages awards. BRP relies on a single case to support its contention, *Exxon*, *supra*, 554 U.S. 471. There, in a five-to-three decision, the United

Jessica to fall off the back into the watercraft's jet stream. The record further shows Adamson likewise could have been "negligent" for failing to train Kohl not to accelerate quickly when passengers board a PWC, particularly when those passengers are novice riders, as noted by Osinski.

34

States Supreme Court reduced a punitive damages award arising from the *Exxon Valdez* oil spill in Alaska by applying a one-to-one ratio of punitive to compensatory damages. (*Id.* at p. 515.)

1. *Exxon*

In *Exxon*, the supertanker Exxon Valdez ran aground, spilling millions of gallons of crude oil in Prince William Sound. Before the accident, the captain of the supertanker drank "at least five double vodkas in the waterfront bars" before he left port. (*Exxon*, *supra*, 554 U.S. at p. 477.) The captain previously had completed a 28-day alcohol treatment program while employed by the defendant but had dropped out of a prescribed follow-up program and had quit attending meetings to help with his sobriety. After the captain was released from the treatment program, "'he drank in bars, parking lots, apartments, airports, airplanes, restaurants, hotels, at various ports, and aboard Exxon tankers.'" (*Id.* at pp. 476-477.) The captain also drank with Exxon officials, who were thus aware of his relapse. (*Id.* at p. 477.) Eleven hours after the spill, the captain's blood-alcohol level was .061, which, according to experts, equated to a blood-alcohol level of around .241, or three times the legal limit for driving in most states, at the time of the accident. (*Id.* at pp. 478-479.)

The defendant in *Exxon* spent around $2.1 billion in cleanup efforts and pleaded guilty to violations of various federal laws, including the Clean Water Act (33 U.S.C. §§ 1311(a), 1319(c)(1)). It also paid $25 million in fines and $100 million in restitution and settled state and federal claims for environmental damage, with payments exceeding

35

$1 billion. (*Exxon*, *supra*, 554 U.S. at pp. 476, 479.) The remaining civil cases were then consolidated and the plaintiffs seeking compensatory damages were divided into three classes: commercial fisherman, Native Alaskans and landowners. In addition, at the request of the defendant, the Court certified a class of plaintiffs seeking punitive damages, which number exceeded 32,000. (*Id.* at p. 479.)

The defendant stipulated to its negligence for the disaster and its liability for compensatory damages. The district court thus tried the case in three phases: "Phase I considered Exxon and [the captain's] recklessness and thus their potential for punitive liability; Phase II set compensatory damages for commercial fishermen and Native Alaskans; and Phase III determined the amount of punitive damages for which [the captain] and Exxon were each liable." (*Exxon*, *supra*, 554 U.S. at pp 479-480.)

"In Phase I, the jury heard extensive testimony about [the captain's] alcoholism and his conduct on the night of the spill, as well as conflicting testimony about Exxon officials' knowledge of [the captain's] backslide." (*Exxon*, *supra*, 554 U.S. at p. 480.) "In Phase II, the jury awarded $287 million in compensatory damages to the commercial fishermen." (*Id.* at pp. 480-481.) "In Phase III, the jury heard about Exxon's management's acts and omissions arguably relevant to the spill. [Citation.]" (*Id.* at p. 481.) The jury subsequently awarded $5,000 in punitive damages against the captain and $*5 billion* against Exxon.

With respect to the award of punitive damages, the Court of Appeals for the Ninth Circuit "remanded twice for adjustments in light of this Court's due process cases before

36

ultimately itself remitting the award to $2.5 billion.  [Citations.]"  (*Exxon*, *supra*, 554 U.S. at p. 481.)  The Supreme Court granted certiorari to consider, among other issues, whether the "punitive damages awarded against Exxon . . . were excessive as a matter of maritime common law."  (*Ibid.*)

The *Exxon* Court discussed the size of punitive damage awards "when wrongdoing is hard to detect (increasing chances of getting away with it), [citation], or when the value of injury and the corresponding compensatory award are small (providing low incentives to sue) [citations]."  (*Exxon*, *supra*, 554 U.S. at p. 494.)  The Court noted that it previously reviewed punitive damages awards at the constitutional level, where it "announced due process standards that every award must pass," but that the case before it involving the *Exxon Valdez* was different because it was examining the "verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard" in the due process cases that, in any event, were subject to and based on state law.  (*Id.* at pp. 501-502, citing, among other authorities, *State Farm Mut. Ins. v. Campbell* (2003) 538 U.S. 408 (*State Farm*).)

Out of concern about the "unpredictability of high punitive awards" and the "implication of unfairness that an eccentrically high punitive verdict carries in a system whose commonly held notion of law rests on a sense of fairness in dealing with one another" (*Exxon*, *supra*, 554 U.S. at p. 502), the Court considered various approaches to judicial review of punitive awards under maritime law.  It rejected what it called "verbal formulations" of judicial review criteria used in some states that are "superimposed on

37

general jury instructions" as a means to prevent "unpredictable outliers." (*Id.* at p. 504.) It instead adopted what it referred to as "quantified limits" as a means of "eliminating unpredictable outlying punitive awards." (*Id.* at p. 506.) Rather than applying a "hard dollar cap on punitive damages," as do some states, the Court determined the best alternative was "pegging punitive to compensatory damages using a ratio or maximum multiple," which it found was a model used by many states. (*Ibid.*)

The Court next turned to the issue of what ratios it should use as a "reasonable limitation[] suited for application to this case. While a slim majority of the States with a ratio have adopted 3:1, others see fit to apply a lower one, [citations], and a few have gone higher [than 3:1] [citation]. Judgments may differ about the weight to be given to the slight majority of 3:1 States, but one feature of the 3:1 schemes dissuades us from selecting it here. With a few statutory exceptions, generally for intentional infliction of physical injury or other harm, [citations], the States with 3:1 ratios apply them across the board (as do other States using different fixed multipliers). That is, the upper limit is not directed to cases like this one, *where the tortious action was worse than negligent but less than malicious*, [fn. omitted] *exposing the tortfeasor to certain regulatory sanctions and inevitable damages actions*;[13] the 3:1 ratio in these States also applies to awards in quite different cases involving some of the most egregious conduct, including malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's

---

13    "We thus treat this case categorically as one of recklessness, for that was the jury's finding.  But by making a point of its contrast with cases falling within categories of even greater fault we do not mean to suggest that Exxon's and [the captain's] failings were less than reprehensible."

financial gain.[14] We confront, instead, a case of reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury. Thus, a legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit in this particular type of case." (*Exxon*, *supra*, 554 U.S. at pp. 510-511.)

The Court in *Exxon* also rejected a two-to-one ratio that it found was adopted by federal statutes, including in patent and trademark cases and in private antitrust actions. With regard to the latter, the Court noted that "Congress devised the treble damages remedy for private antitrust actions with an eye to supplementing official enforcement by inducing private litigation, which might otherwise have been too rare if nothing but compensatory damages were available at the end of the day. [Citation.] That concern has no traction here, in this case of staggering damage inevitably provoking governmental enforcers to indict and any number of private parties to sue." (*Exxon*, *supra*, 554 U.S. at p. 511.)

The Court next looked to several studies where reasonableness of punitive awards were considered in many cases. "These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1, [citation], meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning

---

14    "Two of the States with 3:1 ratios do provide for slightly larger awards in actions involving this type of strategic financial wrongdoing, but the exceptions seem to apply to only a subset of those cases. [Citations.]"

39

system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases (again like this one) without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable outlier cases that call the fairness of the system into question are above the median; in theory a factfinder's deliberation could go awry to produce a very low ratio, but we have no basis to assume that such a case would be more than a sport, and the cases with serious constitutional issues coming to us have naturally been on the high side, see, *e.g., State Farm,* 538 U.S., at 425 (ratio of 145:1); [*BMW of North America, Inc. v.*] *Gore* [(1996)] 517 U.S. [559], 582 (ratio of 500:1)." (*Exxon*, *supra*, 554 U.S. at pp. 512-513.)

Based on these assumptions, and "given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases." (*Exxon*, *supra*, 554 U.S. at p. 513.)

The Court also found persuasive a provision in the Clean Water Act respecting daily fines. It noted that Congress set criminal penalties of up to $25,000 per day for negligent violations of pollution restrictions and up to $50,000 per day for knowing ones.

40

"Discretion to double the penalty for knowing action compares to discretion to double the civil liability on conduct going beyond negligence and meriting punitive treatment. And our explanation of the constitutional upper limit confirms that the 1:1 ratio is not too low. In *State Farm,* we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' [Citation.]" (*Exxon*, *supra*, 554 U.S. at pp. 514-515, fn. omitted.)

The *Exxon* Court accepted the "total relevant compensatory damages at $507.5 million," as determined in an earlier proceeding by a district court and, based on those damages and applying a one-to-one ratio, it reduced the $2.5 billion punitive award accordingly. (*Exxon*, *supra*, 554 U.S. at p. 515.)

2. *Subsequent Impact of Exxon*

Since *Exxon* was decided, other courts have concluded that *Exxon* did not establish under maritime law a bright-line rule limiting punitive damages to the amount of compensatory damages. (See, e.g., *Clausen v. Icicle Seafoods, Inc.* (Wash. 2012) 272 P.3d 827 (*Clausen*), cert. den. *Icicle Seafoods, Inc. v. Clausen* (2012) 133 S.Ct. 199; and *McWilliams v. Exxon Mobil Corp.* (La. Ct.App. 2013) 111 So.3d 564, writ den. *McWilliams v. Exxon Mobil* (La. 2013) 125 So.3d 451 (*McWilliams*).)

In *Clausen*, a plaintiff maritime employee brought an action against his defendant employer after he was seriously injured while working on the defendant's vessel. The plaintiff "encountered persistent difficulties" when he sought payment during his

41

recovery of "maintenance and care," which are "traditional maritime remedies providing living and medical expenses." (*Clausen*, *supra*, 272 P.3d at p. 830.) As a result, the plaintiff was forced to live in a "recreational vehicle with a leaking roof and with no heat, air conditioning, running water, or toilet facilities." (*Ibid.*) The defendant also delayed or refused to pay for treatment recommended by the plaintiff's doctors, including back surgery. (*Ibid.*)

About a year later, the defendant employer filed suit against the plaintiff employee in federal court seeking to terminate his right to maintenance and care based on allegations that the plaintiff allegedly was impeding the investigation into his claim. (*Clausen*, *supra*, 272 P.3d at p. 830.) The plaintiff, in response, filed suit in state court. The jury subsequently found the defendant liable for negligence under the Jones Act (46 U.S.C. 30104) and for wrongfully withholding maintenance and care, and awarded the plaintiff about $490,000 in compensatory damages. The jury also found the defendant "was callous or willful and wanton" in failing to pay the plaintiff's maintenance and care, and awarded him $1.3 million in punitive damages. (*Clausen*, at p. 830.)

Like BRP here, the defendant in *Clausen* contended that as a result of *Exxon*, the punitive damages awarded to the plaintiff was excessive because that amount could be no more than the plaintiff's compensatory damages. In rejecting this contention, the Washington Supreme Court concluded that the Court in *Exxon* expressly limited its holding to the facts there presented, and, thus, it "cannot be read as establishing a broad, general rule limiting punitive damage awards, primarily because nowhere in the opinion

42

can such a rule be found." (*Clausen*, *supra*, 272 P.3d at p. 835.) The *Clausen* court noted that "in the context of analyzing the spectrum of laws and cases establishing limits on punitive awards" (*ibid.*), the Court in *Exxon* observed the one-to-one ratio was a reasonable limit in *that* case because the conduct being punished was at most reckless action that was "'profitless to the tortfeasor'" (*ibid.*, quoting *Exxon*, *supra*, 554 U.S. at p. 511). Thus, the *Clausen* court concluded the Court in *Exxon* "embrace[d] an approach of applying a variable limit based on the tortfeasor's culpability." (*Clausen*, at p. 835.)

The *Clausen* court noted the jury in the case before it had found the defendant employer "acted callously or willfully and wanton in its failure to pay maintenance and cure" to the plaintiff employee. (*Clausen*, *supra*, 272 P.3d at p. 835.) Such acts included paying the plaintiff only $20 per day, when the defendant knew the plaintiff was practically homeless, and attempting to convince him to settle early, without legal representation. The *Clausen* court further noted that unlike the defendant in *Exxon*, the defendant employer's conduct in the case before it "was motivated by profit" and that the "size of the punitive damages award was required because [the defendant] needed substantial deterrence not to treat other workers in the same way it treated [the plaintiff], noting that [the defendant] had claimed no wrongdoing throughout the suit." (*Id.* at p. 836.) Thus, in contrast to the conduct of the defendant in *Exxon*, the defendant employer in *Clausen* engaged in acts that were "far from reckless and nearer the 'most egregious' end of the culpability scale." (*Ibid.*)

Relying extensively on the *Clausen* court's reasoning and analysis of *Exxon*, the Louisiana Court of Appeal in *McWilliams* concluded the one-to-one ratio did not apply to reduce the jury's $12 million punitive damages award after the jury found the defendant oil companies liable for $5.5 million in actual damages. The plaintiff in *McWilliams* worked as a petroleum inspector for 27 years until he developed cancer as a result of exposure to benzene. During five of those years, the plaintiff worked on premises or vessels owned by the oil company defendants. The plaintiff brought suit under maritime law and under the Jones Act against dozens of defendants, including the oil company defendants. (*McWilliams*, *supra*, 111 So.3d at p. 567.)

The Louisiana Court of Appeal in *McWilliams* agreed with the Washington Supreme Court's analysis of *Exxon*: "Therein, the United States Supreme Court did not establish a general rule pertaining to punitive damages, but rather, narrowly tailored that result to the unique case before it. Most notably, the United States Supreme Court must also agree with the *Clausen* court's analysis, as it denied certiorari in that case. The Defendants' assertion that any punitive damage award must adhere to a 1:1 compensatory to punitive damages ratio is devoid of merit." (*McWilliams*, *supra*, 111 So.3d at p. 579.)

3. *Analysis*

Based on our own reading of *Exxon*, we conclude that the Court did not intend to create in "federal maritime common law authority" (see *Exxon*, *supra*, 554 U.S. at p. 502) a bright-line rule limiting punitive damages to the amount of compensatory damages

44

awarded to a plaintiff.[15]  We share the view of the court in *Clausen* that the Court in

*Exxon* applied a one-to-one ratio between punitive and compensatory damages because in

*that* case the defendant's conduct was merely reckless and was not, for example,

"necessarily callous toward the risk of harming others."  (See *Exxon*, at p. 493)[16]

Moreover, we note that the Court in *Exxon* discussed, albeit in dictum, when a

one-to-one ratio would *not* be appropriate, including "when wrongdoing is hard to detect

(increasing chances of getting away with it) . . . or when the value of injury and the

corresponding compensatory award are small (providing low incentives to sue)."  (*Exxon*,

*supra*, 554 U.S. at p. 494.)  For this additional reason, we conclude the *Exxon* Court did

---

[15]    In our independent research on this issue, we found no California court addressing the precise issue before us, namely whether *Exxon* established in maritime cases a bright-line rule limiting punitive damages to the amount of compensatory damages awarded a plaintiff.  However, in non-maritime cases, California courts have been unwilling to apply a one-to-one ratio of punitive to compensatory damages based on *Exxon*.  (See, e.g., *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 568-569 [approving a ratio of about 16:1 because of defendant cigarette manufacturer's "extreme reprehensibility, including the vast scale and profitability of [its] misconduct and its strong financial condition" and, in so doing, noting that *Exxon* "did not signal any departure from the [constitutional] standards articulated in *State Farm*, *supra*, 538 U.S. 438" and that, instead, the one-to-one ratio applied in *Exxon* "merely reflected the enormity of the compensatory damages award and the high court's view that $507.5 million in punitive damages might be the most that would be constitutionally justified in light of the facts and circumstances of that case"].)

[16]    Indeed, with regard to the latter point, we note that before punitive damages were even awarded against the defendant in *Exxon*, it already had spent around $2.1 billion in cleanup efforts; paid a fine of $25 million and restitution of $100 million for violation of various federal statutes; and paid at least $900 million to the United States and the State of Alaska for environmental harms.  Moreover, the defendant also paid compensatory damages of about $19.5 million to the commercial fisherman (after various setoffs) and about $22.6 million to the Native Alaskans.

not adopt a bright-line common law rule in maritime cases limiting punitive damages to the amount of compensatory damages awarded a plaintiff.

Against this backdrop, we now turn to the issue of whether the award of $1.5 million in punitive damages each to Haley and Jessica passes muster under *Exxon*.

With respect to Haley, the jury awarded her a total of $584,459 in economic damages (i.e., $63,301 for past medical expenses and $521,248 for future medical expenses) and $2.8 million (or $933,333 for each defendant based on comparative fault) in past and future noneconomic damages. Pursuant to Civil Code section 1431.2, BRP is joint and severally liable for Haley's "economic damages"[17] but only severally liable for her "non-economic damages."[18] (See *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 600 [noting that Proposition 51—which was codified in Civil Code section 1431.2 to effectuate the voters' intent—"retains the joint liability of all tortfeasors, *regardless of their respective shares of fault*, with respect to all objectively provable expenses and monetary losses" (i.e., economic damages), but "the more intangible and subjective categories of damage [are] limited . . . to a rule of strict proportionate liability" (i.e., noneconomic damages) (italics added)].) Thus, the ratio of punitive ($1.5 million) to

---

[17]  Subdivision (b)(1) of Civil Code section 1431.2 provides "economic damages" are "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities."

[18]  Subdivision (b)(2) of Civil Code section 1431.2 provides "non-economic damages" are "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation."

compensatory damages ($584,549 [economic] + $933,333 [noneconomic]) for Haley is less than one to one.

With respect to Jessica, the jury awarded her a total of $63,494 in economic damages ($12,643 for past medical expenses and $50,851 for future medical expenses) and $1 million (or $333,333 for each defendant based on comparative fault) in noneconomic damages. Thus, the ratio of punitive ($1.5 million) to compensatory damages ($63,494 [economic] + $333,333 [noneconomic]) for Jessica was about 3.78:1. The question becomes whether the 3.78:1 ratio is excessive as a matter of maritime law.

Here, the record shows Jessica sustained serious and permanent injuries to her vagina as a result of the accident. Thus, her injuries were not limited merely to property damage/economic harm as was the case in *Exxon*.

In addition, although the Court confirmed the jury found the conduct of the defendants in *Exxon* was "reckless" and "reprehensible" (see *Exxon*, *supra*, 554 U.S. at p. 510, fn. 23), inasmuch as there was evidence that defendant Exxon knew or should have known of the relapse of the supertanker's captain who had a known history of alcohol abuse and did little if anything about it, the Court in *Exxon* stressed throughout its opinion that Exxon's conduct in terms of fault was on the lower end of the scale of blameworthiness. (See *id.* at p. 510 & fn. 22 [noting that although some states use a three-to-one ratio of punitive to compensatory damages, such a ratio would not apply "to cases like this one, where the tortious action was worse than negligent but less than malicious, [fn. omitted] exposing the tortfeasor to certain regulatory sanctions and

47

inevitable damages action," and noting that "[a]lthough the jury heard evidence that Exxon may have felt constrained not to give [the captain] a shoreside assignment because of a concern that such a course might open it to liabilities in personnel litigation the employee might initiate, [citation], such a consideration, if indeed it existed, hardly constitutes action taken with a specific purpose to cause harm at the expense of an established duty"].)

In contrast, we conclude the conduct of BRP in the instant case was on the higher end of the scale of blameworthiness (when compared to the defendant in *Exxon*). Indeed, the record shows by the late 1990's BRP knew that passengers falling off the back of its PWC's were suffering orifice injuries and that such injuries could be "severe." BRP also knew that when an operator was already seated in the operator's seat, a passenger might not be able to see the warning located under the console of its PWC's. Although BRP considered including one or more additional warnings on its PWC's, including on the back where the warning could be readily seen by a passenger, BRP ultimately decided against doing so based on what Le Blanc referred to as the "dilution effect" that allegedly would result if BRP followed Yamaha's lead and used a multiple warning system. (Cf. *Exxon*, *supra*, 554 U.S. at p. 493 [noting that "[u]nder the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent" and noting that "[r]eckless conduct is not intentional or malicious, *nor is it necessarily callous toward the risk of harming others*" (italics added)].)

On this record, we conclude the $1.5 million in punitive damages awarded to Jessica, when considered in light of the seriousness of her injuries and the amount of her compensatory damages award, is a reasonable and proportionate measure of the blameworthiness of BRP's conduct in failing to adequately warn her of the need to wear the requisite protective clothing to reduce or minimize the risk of potentially severe orifice injury from the PWC jet-thrust nozzle. (See, e.g., *Clausen*, *supra*, 272 P.3d at p. 836 [ratio of 2.65:1 punitive to compensatory (minus attorney fees) was proper based on the jury finding that defendant employer's conduct was "nearer the 'most egregious' end of the culpability scale"]; *McWillaims*, *supra*, 111 So.3d at p. 568 [ratio of 2.18:1 punitive to compensatory was proper]; see also *State Farm*, *supra*, 538 U.S. at p. 425 [refusing at the *constitutional* level to "impose a bright-line ratio which a punitive damages award cannot exceed" but noting that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" and that conversely, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution"]; *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182 [noting that although there is no bright-line rule for determining an acceptable ratio of punitive to compensatory damages for purposes of due process, "past decisions and statutory penalties approving ratios of 3 or 4 to 1 [are] 'instructive' as to the due process norm"], quoting *State Farm*, at p. 425.)

D. Evidentiary Rulings

1. *Admission of Evidence*

BRP contends the trial court abused its discretion and thus erred in admitting certain evidence that it claims was unduly prejudicial. Evidentiary rulings, including those made in limine, are reviewed for abuse of discretion. (*Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1480-1481.) An abuse of discretion is established only when there is a clear showing the determination exceeded the bounds of all reason under the circumstances. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 (*Shaw*).)

However, even if evidence is improperly admitted, "[n]o judgment shall be set aside, or new trial granted . . . unless, after an examination of the entire cause . . . the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see Evid. Code, § 353, subd. (b).) A "miscarriage of justice" occurs when the party appealing shows that a "different result would have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480 (*Zhou*).)

BRP contends the trial court erred in admitting into evidence the fact that BRP had received other claims of orifice jet-thrust injuries to passengers riding on its PWC's. BRP contends the admission of such evidence "runs afoul of the law," ostensibly because such evidence was "irrelevant" and/or "hearsay."

Initially, we note that BRP cites no legal authority in the argument portion of its brief to support this contention. In any event, we conclude the court did not err when it ruled to admit such evidence, inasmuch as it was relevant to show BRP, before the injury to plaintiffs, knew of a potential defect to its PWC's (see *Anderson*, *supra*, 53 Cal.3d at p. 995 [noting a product defect includes a warning defect]) based on other, relatively recent incidents of orifice injuries to its passengers. (See, e.g., *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 404 (*Hasson*) [rejecting argument the trial court abused its discretion in admitting into evidence letters sent to defendant car manufacturer and testimony describing brake failure in various models of cars in various years because such evidence was relevant to show the defendant had notice of a dangerous condition and noting that when such evidence is offered to show a dangerous condition, "the requirement of similarity of circumstances is relaxed"].)

Indeed, there is evidence in the record that these other incidents of orifice injury involved passengers like Haley and Jessica who ostensibly wore "regular" bathing suits and who sustained an injury to their rectum and/or vagina from the jet stream after falling off the back of a PWC manufactured by BRP. To admit such evidence, plaintiffs were not required to show "'identical conditions'" between the various incidents; rather, "'[s]ubstantial similarity is normally sufficient,'" and this "determination 'is primarily the function of the trial judge.'" (*Hasson*, *supra*, 32 Cal.3d at p. 404.) BRP thus did not make a showing, much less a clear showing (*Shaw*, *supra*, 170 Cal.App.4th at p. 281), that the court abused its discretion in admitting this evidence.

51

BRP's second claim of error is the admission of Kitzes's expert testimony that BRP's label was insufficient and incomprehensible. BRP claims this testimony should have been excluded as irrelevant because the subject warning on the console was not read or relied on by any person involved in the accident in this case. As before, BRP has provided no citation to legal authority to support this claim.

Reaching the merits, we reject this argument because—as demonstrated by the record in this case and confirmed by its briefing to this court—BRP has repeatedly and aggressively argued it should not be liable to Haley and Jessica for compensatory and punitive damages precisely because it did in fact warn of injury to "body cavities" and "lower body opening(s) of males or females" from "forceful water entry" as a result of "falling into [the] water or being near [the] jet thrust nozzle." Thus, Kitzes's testimony regarding the adequacy of BRP's warning was relevant and admissible to counter such argument, and it was up to the jury to determine the weight, if any, to be given to his testimony and to resolve the conflict in the evidence on this issue.[19] (See *Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1256-1257 (*Humane Society*) [noting the general rule that a witness qualified to testify as an expert may offer

_____

[19] We deem it unnecessary to respond to BRP's alternate contention that Kitzes's testimony on this subject matter was also irrelevant because "*literally everyone involved in the accident perfectly understood [BRP's] warning label once they read it.*" There is no dispute that neither Haley nor Jessica saw the warning label on the subject PWC or that Kohl failed to warn them of the need to wear a wetsuit bottom or similar protective gear, *before* they boarded the watercraft on the day of the accident. What plaintiffs, Kohl, Adamson and others came to understand *after* the accident about orifice injuries, including how they occur and how to prevent them, is in our view wholly irrelevant in this case.

an opinion related to a subject that "'is sufficiently beyond common experience that the opinion . . . would assist the trier of fact'"].)

BRP also contends Kitzes's warning label testimony should have been excluded because he did not test his theories and they were, in any event, not based on "other scientific process." That Kitzes allegedly did not test his theory that BRP should have included on the back of its PWC's a warning to passengers regarding the risk of orifice injuries and how to prevent them, in our view, again goes to weight, not admissibility (see *Humane Society*, *supra*, 214 Cal.App.4th at pp. 1256-1257), particularly in light of the testimony of both Haley and Jessica that *if* they had seen such a warning they either would have obtained protective clothing (as recommended by BRP) or not ridden on the PWC on the day of the accident.

BRP's third claim of error involves the admission of the 2006 safety video produced and promoted by BRP showing some passengers and operators riding on PWC's with regular bathing suits and not wearing wetsuit bottoms or similar protective clothing. BRP contends that because "no one involved" in the accident had seen the video, it was irrelevant and should have been excluded from evidence. To support this contention, BRP relies on *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539 (*Ramirez*).

There, our high court held a manufacturer of a nonprescription drug cannot be liable in negligence for failing to include foreign-language warnings in its packaging materials. (*Ramirez*, *supra*, 6 Cal.4th at p. 542.) Noting the "importance of uniformity and predictability in this sensitive area of the law," the court concluded that "the rule for

53

tort liability should conform to state and federal statutory and administrative law," both of which required warnings in English but not in any other language. (*Ibid.*)

The plaintiff in *Ramirez* alternatively contended that even if the defendant was not required to include a warning in Spanish, the defendant was nonetheless liable because the warning provided in English was inadequate. Our high court rejected this argument, noting that the plaintiff's mother neither could read English nor did she have it translated into Spanish. As such, it concluded there was no "causal connection between the representations or omissions that accompanied the product and plaintiff's injury." (*Ramirez*, *supra*, 6 Cal.4th at p. 556.)

We are not persuaded by *Ramirez* that the court here erred in admitting portions of the 2006 safety video. For one thing, the portion of *Ramirez* cited and relied on by BRP involved causation, or lack thereof, which the record shows was not the basis of admission of the safety video in the instant case.

In any event, we conclude the safety video was clearly relevant on the issue of whether BRP engaged in conduct that manifested a reckless or callous disregard for the rights of plaintiffs, particularly in light of the fact that the subject warning, as confirmed by Le Blanc, stated it was a "must" for riders to wear protective clothing and the video showed some passengers wearing only "regular" bathing suits, and in light of the fact that BRP knew of other claims of orifice injuries dating back to the mid-1990's and of the severity of such injuries.

BRP's fourth claim of error involves the admission of expert testimony by Kitzes and Osinski regarding what it refers to as improper "[c]haracterizations of [its corporate] [a]ctions." As pointed out by plaintiffs, BRP, in connection with this argument, does not include a single citation to the record showing this allegedly improper testimony and whether BRP objected to its admission. For this reason alone, we reject this claim of error.[20] (See Evid. Code, § 353 [providing a "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; see also *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-800 (*Dietz*) [noting that to "'preserve an issue for appeal, a party ordinarily must raise the objection in the trial court'" and noting that a party "'also must cite to the record showing exactly where the objection was made'"].)

However, even if the trial court erred in admitting such expert testimony, we conclude BRP has failed to show how its admission resulted in a miscarriage of justice, namely "that a different result would have been probable if the error had not occurred." (See *Zhou*, *supra*, 157 Cal.App.4th at p. 1480.)

BRP's fifth and final claim of error involves the admission of BRP's alleged unlawful conduct occurring outside California. Specifically, BRP contends the trial court

---

20    Based on our own independent, lengthy review of the testimony of both experts referenced, it does not appear that BRP objected to what it contends was improper testimony regarding BRP's "mission statement" and "internal committees."

55

erred by allowing plaintiffs to admit evidence regarding other orifice injuries that had no

nexus to California. In support of this contention, BRP primarily relies on *White v. Ford

Motor Co.* (9th Cir. 2002) 312 F.3d 998 (*White*) among other authorities.

In *White*, the parents of a three-year-old child brought a products defect case

against Ford and other defendants after a parking brake on a Ford truck failed, causing it

to run over the child. The plaintiffs alleged Ford knew the parking brake was prone to

failure but nonetheless did not recall this make of truck or otherwise warn consumers of

the danger. The jury subsequently awarded the plaintiffs about $2.3 million in

compensatory damages and about $151 million in punitive damages, which the district

court remitted to about $69 million. (*White*, *supra*, 312 F.3d at p. 1002.)

As relevant to our discussion here, the defendant car manufacturer sought reversal

of the punitive damages award because the district court refused its instruction on

extraterritoriality, which provided that in determining punitive damages, if any, the jury

could "'consider only Defendant's wrongful conduct that had an impact on the citizens of

Nevada," where the accident occurred. (*White*, *supra*, 312 F.3d at p. 1013.)

In reversing, the Ninth Circuit Court of Appeals held the "punitive damages award

unconstitutionally allowed a Nevada jury to punish Ford for out-of-state conduct."

(*White*, *supra*, 312 F.3d at p. 1020.) The *White* court based its decision on the Supreme

Court decision of *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 (*Gore*),

which "imposed a territorial limitation on punitive damages in the interest of federalism.

This federalism includes the flexibility for a state to have whatever policy it chooses,

56

subject to constitutional and congressional limits.  For that flexibility to exist, no state can be permitted to impose its policies on other states.  Because no single state could 'impose its own policy choice on neighboring States,' the Court [in *Gore*] held that 'a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.'"  (*Id.* at pp. 1013-1014, fn. omitted, quoting *Gore*, at pp. 571-572.)

We conclude *White* is inapposite here.  First, unlike the facts of *White* where the jury there was permitted to award punitive damages to "vindicate the interests of all Ford pickup truck buyers" and where the "national evidence was not limited by any jury instructions or admonitions to limit its relevance to reprehensibility" (*White*, *supra*, 312 F.3d at p. 1015), in the instant case the jury was instructed that it was *not* to award punitive damages to nonparties and that any evidence of harm to nonparties was to be considered *only* "in determining the reprehensibility of BRP's conduct, and not in assessing the amount, if any, of punitive damages."[21]

Moreover, during closing argument in *White*, the plaintiffs specifically asked the jury to punish Ford "for its conduct toward consumers in all states, not just Nevada. Plaintiffs' attorney emphasized that 'there are 884,000 people *in this country* who have

---

[21]    The Ninth Circuit, in a follow-up case, *White v. Ford Motor Co.* (2007) 500 F.3d 963, 972, again reversed the punitive damages awarded to the plaintiffs, which, on remand, the jury had set at $58 million, because the district court refused Ford's proposed instruction that, although the jury could consider harm to other people in assessing reprehensibility, the jury was only allowed to punish the defendant for the harm to the plaintiffs in that case.  In light of the jury instructions given in the instant case, we conclude this case is also inapposite here.

these vehicles that got a letter that didn't tell them the truth as to why these vehicles were being recalled' and 'your verdict for punitive damages must be loud enough so that it is on the front page of every newspaper tomorrow morning, so *every person in this country* knows, if they have that vehicle, they can take it into the shop and get it fixed.'" (*White*, *supra*, 312 F.3d at p. 1015, fn. omitted.)

In contrast, our independent review of the record (as confirmed by the jury instructions) shows plaintiffs did not ask the jury to punish BRP for injury to anyone other than Haley and Jessica. Indeed, during the closing in the punitive damages phase of the trial, plaintiffs' counsel told the jury it was to determine "how much money damages will inflict sufficient monetary pain on a corporation [i.e., BRP] to punish it for its reckless and callous disregard of the rights *of these two young ladies . . . .*" (Italics added.) And although the record shows plaintiffs referenced the other claims of orifice injuries then known to BRP, it did so in the context that such injuries are severe and that BRP knew such injuries were occurring, both of which, we conclude, went to the issue of reprehensibility, which was a proper subject for the jury to consider in making its determination whether to award punitive damages.

Second, the ratio of the jury's award of punitive to compensatory damages in *White* is strong evidence the jury sought to punish Ford for its conduct outside Nevada. Indeed, the jury there awarded the plaintiffs about $2.3 million in compensatory damages and about $151 million in punitive damages, or a ratio of punitive to compensatory damages of about 66:1 (or 30:1 after the punitive damages award was remitted to about

58

$69 million). (*White*, *supra*, 312 F.3d at p. 1002.) Here, in contrast, the ratios of punitive to compensatory damages for Haley was less than one to one and for Jessica about 3.78:1. These ratios, in our view, support the inference the jury punished BRP for its conduct with respect to plaintiffs only.

Finally and perhaps most importantly, as we repeatedly have noted, the instant case is governed by federal maritime law. As such, the federalism concerns of one state seeking to impose its own policies on another state, as was the case in *White* (Nevada law) and *Gore* (Alabama law), are nonexistent. For this separate reason, we conclude *White* and similar cases cited by BRP are inapplicable to our case.

2. *Exclusion of Evidence*

BRP lumps together its claims of alleged error by the trial court in excluding certain evidence, which BRP generally argues established its "state-of-mind towards product safety and warnings to protect its customers and others for purposes of determining whether punitive damages should be awarded."

Specifically, BRP contends that it was not allowed to show other portions of the safety video, which actually "promoted clear safety warnings and instructions" and which BRP contends it had improved after the accident to Haley and Jessica; that the other orifice injuries known to BRP allegedly "were not caused by any inadequate warnings"; and that it "reasonably believed" the lack of a recall by, and the receipt of a commendation letter from, the United States Coast Guard (USCG) showed its safety efforts "were positive" and did not warrant the jury's punitive damages finding.

59

Turning first to its claim of error regarding the safety video,[22] as plaintiffs correctly note the record does not support BRP's contention that the trial court refused to allow it to play other portions of the safety video for the jury. Indeed, this exact issue came up in the hearing on BRP's posttrial motions when BRP argued the trial court should have excluded the safety video or allowed BRP to show the entire video:

"[BRP Counsel]: Because that's all the plaintiff showed. We [BRP] wanted to show the entire video, and I can't -- *I don't want to say on the record we were not allowed to.*

"The Court: No, You don't say that.

"[BRP Counsel]: I don't recall.

"The Court: You don't say that. *Because I did not say that you couldn't show it.*" (Italics added.)

This colloquy clearly shows BRP was not prohibited at trial from showing other portions of the safety video as it now contends on appeal. It further shows BRP *then* refused to even make that argument to the trial court ostensibly because BRP knew it was

---

22    We find this contention by BRP somewhat disingenuous inasmuch as it also aggressively argued the 2006 safety video should have been excluded because allegedly "nobody involved in the case had seen or relied upon" it. BRP simply cannot have it both ways. (See *Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 558 (*Ferraro*) [noting that the doctrine of judicial estoppel "rests on the principle that litigation is not a war game unmoored from conceptions of ethics, truth, and justice," that "[o]ur adversarial system limits the affirmative duties owed by an advocate to his [or her] adversary, but that does not mean it frees him [or her] to deceive courts, argue out of both sides of his [or her] mouth, fabricate facts and rules of law, or seek affirmatively to obscure the relevant issues and considerations behind a smokescreen of self-contradictions and opportunistic flip-flops"].)

not true.  We therefore conclude BRP is estopped from making this argument to *this* court.  (See *Ferraro*, *supra*, 161 Cal.App.4th at p. 558; see also *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422  [noting that the """'dual goals'""" of the judicial estoppel doctrine """'are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies'"""].)

BRP also contends the trial court improperly refused to allow it to admit evidence showing it had improved the safety video *after* the accident to Haley and Jessica.  Again, we note BRP, in connection with this argument, does not include any record citations, including when it unsuccessfully sought to admit such evidence and the reason(s) the court excluded it.  As such, we reject this claim of error.  (See *Dietz*, *supra*, 177 Cal.App.4th at pp. 799-800.)  In addition, it would appear such postaccident evidence was properly excluded under Evidence Code section 1151 as a subsequent remedial measure.

Finally, even if the trial court erred in excluding the improvements to the safety video made by BRP postaccident, we further conclude BRP has failed to show how its exclusion resulted in a miscarriage of justice under the circumstances of this case.  (See *Zhou*, *supra*, 157 Cal.App.4th at p. 1480.)  Indeed, the fact BRP improved the video postaccident supports the reasonable inference that the video was inadequate to begin with in warning passengers such as Haley and Jessica of the risks of orifice injury and how to prevent them.  (See *Burton v. Cruise* (2010) 190 Cal.App.4th 939, 946 [noting

61

that a court of review construes "any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance"].)

BRP, in its second claim of error, contends it should have been allowed to admit evidence to show that the other orifice claims known to it at or near the time of the accident were not caused by an inadequate warning. The record shows the court sustained on the grounds of relevancy (Evid. Code, § 350) and undue consumption of time (*id.*, § 352) among others plaintiffs' objection to the question posed by BRP to one of its engineering experts regarding the "facts" of the other claims of orifice injuries to passengers.

The record further shows that in posttrial motions, the trial court found the other claims of orifice injury were relevant to show BRP had *notice* of such injuries, but the facts regarding "what happened and who they were or whatever is really irrelevant. [W]hat is relevant is, is that these machines cause injury. And your client, putting these things out to the public, has a duty to make sure that they are made safe or the person who uses them realizes the danger and the risk and then goes ahead. In other words, realizes that they have to make sure in a reasonable way that the person realizes the danger."

We review the trial court's exclusion of the "facts" of these other orifice injuries for abuse of discretion and conclude on this record there was none. (See *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.) Evidence Code section 352 grants the trial court broad discretion to exclude evidence if its probative value is substantially

outweighed by the probability its admission will (1) require undue consumption of time or (2) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Here, even assuming arguendo the "facts" of other orifice injuries were marginally relevant (at best), we conclude the trial court nonetheless properly exercised its discretion under Evidence Code section 352 in excluding such "facts" because their admission would have led to myriad "mini-trials" regarding these other claims and thus distracted and confused the jury and consumed undue time.[23]

BRP, in its third and final claim of error, contends it should have been allowed to admit evidence to show that the USCG allegedly approved BRP's PWC's, ostensibly including the subject PWC, because the USCG "never required [BRP] to change or recall the design or change the location" of its warning label and because it received a commendation letter from the USCG.

The record shows the trial court ruled in limine to exclude evidence of the "Federal Safety Boating Act, Coast Guard regulations and Coast Guard approval," as well as a letter from the USCG commending BRP and other manufacturers for the creation of a uniform warning label. In connection with its ruling, BRP's trial counsel stated on the

---

[23]     BRP also claims the trial court also erred in refusing to admit evidence to show that BRP in at least one case had not been found liable for failing to warn of orifice injury from the jet thrust of its PWC's. However, the record shows BRP and its counsel agreed during in limine proceedings that such evidence was inadmissible and noted that otherwise, "[I]f I do that [i.e., speak about verdicts in another case], I would have to stand up and talk about settlements as well," which BRP counsel understandably did not want to do as this undoubtedly would have been prejudicial to BRP.

record that BRP has "never said that the Coast Guard -- or the witnesses have never testified that the Coast Guard approved [of the design of the subject PWC]."

Instead, BRP's trial counsel stated as follows the reason(s) BRP wanted to introduce the USCG in this case:

"But the issue that we want to bring up is that the Coast Guard, as mandated by Congress, to be in charge of, through the Federal Boating Safety Act, and in charge of safe boating . . . does have standards, *which I don't think there are any that are applicable in this case*, but they are also mandated to determine whether or not recreational boats are hazardous, and that would be the issue that we want to cover with . . . regard to the Coast Guard. . . . In fact, [plaintiffs' accident reconstruction expert] wrote a book about boating accidents and boating safety, and in that book he talks about the duty of the Coast Guard in evaluating recreational boats to determine whether or not there is a hazard because the Coast Guard then [can] mandate *a recall* on these type of boats." (Italics added.)

The trial court rejected this proffer of evidence of the lack of a recall by the USCG, ostensibly to show BRP's PWC's were not hazardous, ruling in part as follows:

"There is going to be no mention in this trial whether some governmental authority, either approves or disapproves, of the design of this machine. That includes the mandate that Congress has given to the Coast Guard, et cetera. And no expert is going to use that argument, either for or against, either the plaintiffs' experts or the

defense experts, period. This thing is going to stand or fall on actual expert testimony, as to the design, et cetera, all right."

BRP's trial counsel in response offered his own opinion why the USCG does *not* say whether a particular "machine is good or it's okay with these modifications," noting:

"And actually I have heard [a captain in the USCG] testify in another case that the reason the Coast Guard doesn't do that [i.e., say whether a machine is good or not] is they leave that up to the manufacturers to come up and determine how to safely manufacture a boat. The Coast Guard then evaluates whether the boat is a hazard and if it's a hazard, then they will recall it."

The record shows after the trial court reiterated that no evidence of the USCG would be admitted at trial, it asked counsel if "we get away from the Coast Guard stuff, we are okay, right?," to which BRP's counsel responded, "We are good on that one."

Assuming this issue was preserved for appeal, we conclude on this record that the trial court properly exercised its discretion when it ruled to exclude evidence that the USCG allegedly "approved" of the BRP watercraft, including the model PWC involved in the accident, because no recall of its watercrafts was ever issued. In our view, such evidence has little or no bearing on whether the subject PWC was properly designed, was equipped with proper and effective safety warnings and/or was otherwise safe.[24] (See *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 67 [reversing dismissal of a plaintiff's

---

[24] We are not inferring that, or deciding in this case whether, the issuance of a recall notice by the USCG would have been admissible to show the subject PWC was in fact defectively designed.

common law tort action after his spouse was struck and killed by the propeller of an outboard motor that the plaintiff claimed was unreasonably dangerous, and noting the USCG's decision not to regulate or require propeller guards on outboard motors "was undoubtedly intentional and carefully considered," but that decision did "not convey an 'authoritative' message of a federal policy against propeller guards [and] nothing in the Coast Guard's recent regulatory activities alters this conclusion"].)

We also disagree with BRP that the trial court erred when it excluded on the basis of hearsay the August 1999 letter from a USCG captain commending manufacturers of PWC's, including BRP, for their efforts "on addressing the causes of PWC accidents" and for creating a uniform warning label for PWC's.[25] BRP does not contend the trial court incorrectly ruled that letter was hearsay or that an exception to the hearsay rule applied. (See, e.g., Evid. Code, § 1280 [providing in part that evidence of a writing is not inadmissible as hearsay "if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."].)

Instead, BRP generally contends under Evidence Code section 356 that the trial court erred when it refused to admit this (and other categories of) evidence. Evidence Code section 356 provides in part: "Where part of an act, declaration, conversation, or

---

[25] We note BRP once again failed to include in its briefing a citation to the record where this letter could be found, although we are fortunate that at least BRP cited to its opposition to plaintiffs' motion in limine where this issue was discussed.

writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party"

Here, the record shows that plaintiffs did not move to admit the August 1999 letter, and, therefore, Evidence Code section 356 does not apply to it.[26] However, even if the trial court erred in excluding the August 1999 USCG letter, we conclude BRP has failed to show how its exclusion resulted in a miscarriage of justice under the circumstances of this case, given that BRP ultimately did not use the uniform warning label on its PWC's, including the subject PWC. (See *Zhou*, *supra*, 157 Cal.App.4th at p. 1480.)

## DISPOSITION

The judgment for plaintiffs Haley Colombo and Jessica Slagel is affirmed. Plaintiffs to recover their costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

IRION, J.

---

[26] Moreover, the record shows that when plaintiffs attempted to admit a letter from the USCG they contended was critical of work done by one by BRP's expert witnesses in order to impeach this witness's credibility, the trial court likewise excluded this letter on the basis of hearsay among other grounds.

67