Filed 8/27/15  Sidhu v. Frank-Lin Distillers CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SANDEEP SIDHU, | H038812 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-09-CV149097) |
| v. | |
| FRANK-LIN DISTILLERS PRODUCTS, LTD., | |
| Defendant, Cross-Complainant and Respondent; | |
| UNION PACIFIC RAILROAD COMPANY et al. | |
| Cross-Defendants and Respondents. | |

Plaintiff Sandeep Sidhu brought this action for personal injuries he sustained when a train operated by his employer, defendant Union Pacific Railroad Company (Union Pacific), collided with a gate owned by defendant Frank-Lin Distillers Products, Inc. (Frank-Lin).  A jury returned a verdict for plaintiff but reduced his recovery by three-quarters on a finding that he was 75 percent responsible for his own injuries.  On appeal he contends that the court committed prejudicial error by excluding evidence that a train had collided with the gate in question about eight years before he was injured.  We find

the record insufficient to sustain plaintiff's burden of demonstrating that the court abused its discretion by excluding the evidence. Accordingly, we will affirm the judgment.

## BACKGROUND

On June 2, 2009, plaintiff was employed as a brakeman assisting in the movement of rail cars to and from businesses in the northeast sector of San Jose. The accident at issue here arose during the removal of a string of cars (known as a "cut" or "consist") from the premises of defendant Frank-Lin, a bonded distillery. To enter or leave the premises the consist had to pass through a chain-link gate which crossed a curving portion of the track at an oblique angle. The gate consisted of two leaves or panels, to which we will refer as the western and eastern panels, respectively.[1] The panels were 20 feet long and designed to be six feet high, though as built they may have been seven feet high. Each leaf was determined by one of plaintiff's experts to weigh "about 300 pounds." Plaintiff presented evidence to the effect that at the time of the accident, and at various earlier times, the western panel was difficult to open; it dragged on the ground and lacked a functioning "keeper" or device to hold it in place at a position outside the "foul" or "red zone" in which contact with a train was possible.

Plaintiff had not previously worked the Frank-Lin location, and on the date of the accident was given no specific instruction or advice concerning any difficulties with the gate there. He testified that when the cars were brought through the gate into Frank-Lin's premises, he was unable to move the west gate without assistance from the conductor. After the two of them got it open, an incoming consist was brought through the gate without incident. When they began to remove the outgoing consist, the gate appeared to

---

[1] The parties adopted a convention at trial of distinguishing the leaves by their relative positions when viewed from outside the property; thus the leaf involved in plaintiff's injuries—the western one—was named the "left" gate. We find this approach confusing—as parties and witnesses sometimes did—and thus refer to the leaves by their relative compass locations.

2

plaintiff to be where they had left it during entry. He testified that as the cars passed through, he placed his left hand on the gate. He did so, he said, to give the gate a "little nudge" in his direction, and also to prevent it from swinging toward the train due to vibration. He believed the gate was in the clear, i.e., outside the foul or red zone, based on the "one arm" test he had conducted when the cars entered the facility.[2] The first car, or front of the first car, cleared the gate "by at least a foot." He then looked away—in order, he testified, to watch for traffic movements or other developments that might affect the operation. He heard a thump and felt his hand being pulled along with the train. He radioed the conductor to stop the train. The center of the car had come in contact with the gate, pinning his hand and inflicting severe crushing and degloving injuries.

Plaintiff brought suit against Union Pacific, Frank-Lin, and West Coast Fence, Inc., a local business he charged with negligent construction or repair of the gate. After a trial spanning over five weeks, a jury found by special verdict that Union Pacific and Frank-Lin, but not West Coast Fence, were negligent; that their negligence was a cause of injury to plaintiff; that plaintiff had suffered about $1.7 million in past and future economic damage, plus $350,000 in past and future pain and suffering.[3] The verdict also recited the parties' stipulation that plaintiff had incurred some $380,000 in past and future medical expenses. However the jury allocated responsibility for these injuries 15 percent to Frank-Lin, 10 percent to Union Pacific, and 75 percent to plaintiff.

---

[2] The one-arm test consists of standing next to the track and swinging one's fully extended arm to see whether it contacts an object that may be within the foul. If it does not, the object is judged to be in the clear. Defendants contested the premise that plaintiff had conducted a proper one-arm test.

[3] The jury was asked to determine plaintiff's economic damages "pre-tax" with respect to Frank-Lin, and "after tax" with respect to Union Pacific. We have cited the pre-tax figures.

3

Plaintiff brought a motion for new trial or additur.  The court denied the motion.  This timely appeal followed.[4]

## DISCUSSION

### A.  *Procedural Background*

The sole question on appeal is whether the trial court properly excluded evidence of a 2001 incident in which a train collided with the gate at the Frank-Lin premises.  The issue arose on motions in limine brought by Frank-Lin and Union Pacific.  Frank-Lin objected that evidence concerning that incident was "irrelevant and speculative, will confuse the jury, unfairly prejudice Frank-Lin, and necessitate undue consumption of time."  Union Pacific asserted that the evidence (1) lacked foundation; (2) would call for speculation by the jury; and (3) would possess more prejudicial potential than probative value.  Both movants emphasized the deposition testimony of John Holmes, the conductor in charge of the operation during the 2001 incident, who was the most nearly percipient witness to the incident, but who failed to give any definite account of its cause.  Union Pacific also contended in essence that the incident was so remote in time that it was impossible to say whether the configuration of the gate at that time was similar enough to its condition when plaintiff was injured to permit a reasoned inference about any relevant fact.  Plaintiff responded that (1) the two incidents were "strikingly similar"; (2) any ambiguity in the testimony of Holmes could be clarified in his testimony at trial; and (3) the objecting defendants were exaggerating the degree of similarity necessary to warrant admission of the evidence, particularly as it might support an inference that defendants were on notice of a dangerous condition.  In response to Frank-Lin's contention that intervening repairs had rendered any inference of notice from the 2001 incident too attenuated, plaintiff contended that the number and frequency of repairs was

---

[4] West Coast has filed a protective respondent's brief, but plaintiff concedes in his reply brief that "the judgment in favor of West Coast Fence should be affirmed."

4

itself evidence that defendants were on notice of a dangerous condition. The trial court granted the motions in limine and refused to alter this ruling despite repeated entreaties by plaintiff through the course of trial. This ruling was also a primary subject in plaintiff's motion for new trial, which the court denied.

## B. Principles

Where a plaintiff has suffered injuries due to the alleged negligence of another, proof of similar potentially injurious incidents at the same location may be admissible as circumstantial evidence of (1) a dangerous condition, (2) the defendant's actual or constructive knowledge of the condition, (3) negligence in failing to correct the condition, or (4) the cause of the plaintiff's injuries. (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 106, pp. 512-513, citing *Gilbert v. Pessin Grocery Co.* (1955) 132 Cal.App.2d 212, 282.) " 'The question of the admissibility of evidence of prior and subsequent accidents is primarily one for the trial court and is confined to its sound discretion. [Citation.]' " (*Genrich v. State of California* (1988) 202 Cal.App.3d 221, 233, quoting *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 365.) It follows that, on appeal, the ruling can only be set aside upon a "clear showing" that it "exceeded the bounds of . . . reason under the circumstances." (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1474-1475.)

Plaintiff contends that the court below abused its discretion by excluding evidence of the 2001 collision. He asserts that the evidence was admissible at least to establish that Union Pacific and Frank-Lin had constructive notice that the gate which ultimately injured plaintiff was in a dangerous condition. He cites the rule that when evidence of a prior accident is offered to show notice, a lesser degree of similarity is required to sustain its admission than when it is offered for one of the other purposes noted above. (See *Colombo v. BRP US Inc.*, *supra*, 230 Cal.App.4th at p. 1475, quoting *Hasson v. Ford*

5

*Motor Co.* (1982) 32 Cal.3d 388, 404 [when evidence is offered to show notice of dangerous condition, " 'the requirement of similarity is relaxed' "].)

### C. Preservation of Objection

Union Pacific asserts that plaintiff "waived" any error in excluding the 2001 incident as evidence of notice because he failed to adequately communicate to the trial court that the evidence was being offered for that limited purpose. But a review of the record can leave no honest doubt that plaintiff was offering the evidence on the issue of notice, whether or not he also offered it to establish other elements of his case. At the first hearing on the admissibility of the 2001 incident, after reading passages from the deposition of conductor Holmes, counsel for plaintiff said, "All of this goes to the issue of notice, Your Honor. . . . [¶] . . . [T]his issue goes to notice to these Defendants." Plaintiff had also communicated this theory of admissibility in his trial brief, and he repeated it throughout the course of trial. His presentations included repeated citations of the above rule that " 'requirement of the similarity of conditions is "much relaxed" . . . when the purpose of the offered evidence is to show notice.' " (Quoting *Laird v. T. W. Mather, Inc.* (1958) 51 Cal.2d 210, 220.) Nor was the point lost upon the trial court, which described the motions in limine as resting on the premise, which it ultimately adopted, "that there's no sufficient information as to exactly what happened in 2001 to determine whether or not it's sufficiently similar to provide *proof of notice* to Union Pacific that there was a defect of the gate or the keeper or something else." In view of this record, Union Pacific's claim of "waiver" is extravagantly unsound.

### D. Error

Any analysis of claimed error in the exclusion of evidence must begin by determining the "substance . . . of the excluded evidence" as "made known to the court." (Evid. Code, § 354, subd. (a).) For purposes of this appeal, the substance of the disputed evidence consists of the deposition transcripts of conductor John Holmes and manager

6

Paul Siegmund, and the exhibits identified by those witnesses in deposition. Plaintiff apparently subpoenaed both witnesses to testify at trial, but never actually called them, presumably because their anticipated testimony was barred by the court's ruling excluding evidence of the 2001 incident. That ruling must therefore stand or fall with the deposition testimony, and exhibits, on which all parties relied in their arguments to the court.[5]

The deposition testimony of John Holmes—the conductor in charge of the 2001 operation, and apparently the person most nearly in a position to say how it occurred—reflected but a very limited recollection, at best, of what actually happened. He initially testified that he thought he had been the brakeman, not the conductor, on that occasion. Six pages later, however, he acknowledged that he had been the conductor and, as such, was responsible for the move and obliged to "take the heat" for the collision. He nonetheless believed that the move had been handled by the brakeman, whose identity he could not recall, and that he, Holmes, might have been elsewhere when the gate was hit. In any event he neither saw nor heard the collision; all he recalled is being told "that we hit the gate."[6] Shown a picture of the damaged gate, he denied any memory of seeing it even after the accident, adding that he could not recall whether he had been "on the

---

[5] At one point plaintiff asked to "bring in Mr. Holmes on a 401 hearing so the Court can hear the actual testimony." (See Evid. Code, § 401 [authorizing separate hearing on preliminary facts].) The court deferred a ruling on the request. We see no indication that this request was further pursued by plaintiff.

[6] We reject defendants' suggestion below that Holmes had to witness the collision to be able to testify about it. As regards notice of a dangerous condition, what matters is not what the defendant personally saw but what it, through its agents, understood had occurred. The basic problem with the evidence proffered by plaintiff was that one witness was unable to articulate any clear understanding of what had occurred, and the other appeared to believe that the incident was wholly attributable to human error on the part of the first witness.

7

engine or at another industry checking it out while he's [i.e., the brakeman is] spotting that."

Mr. Holmes acknowledged that it was the western gate panel that was hit by the train. But when asked if he knew "why the gate got into a position where it was impacted by the consist," he replied, "No, like I say . . . I can't recall exactly what was stated as far as the accident at this date and time." (Ellipsis in transcript.) He was then asked whether, prior to and on this occasion, there was a "keeper mechanism on the ground for holding the gate in place." He replied, "Like I say, it was . . . the keeper was missing because we had reported it." (Ellipsis in transcript.) Asked if he believed the missing keeper had been reported prior to the 2001 incident, he replied, "I would say yes." Asked if he remembered the missing keeper ever being replaced, he replied that he did not. He again confirmed that the keeper had been missing on the occasion of the 2001 collision. He testified that he believed a keeper had once been there, but as we understand the deposition testimony he placed it at a location in the middle of a sidewalk or cement apron, where no other evidence suggests there had ever been a keeper. Further, in a few pages he testified that he did not remember whether a keeper had been present or not at the time of the 2001 collision. He testified that train crews had constructed a makeshift keeper of wire, but this proved to be in reference to the eastern gate panel, which was not implicated in either the 2001 incident or the incident injuring plaintiff. Still apparently referring to that panel, he testified, "It wouldn't stay open. It would . . . [¶] . . . [¶] Q. Swing. Towards the track. [¶] A. Right." (First ellipsis in transcript.) Asked if the makeshift keeper was in addition to a malfunctioning keeper, he said, "I can't recall if the keeper was there but I know it was on the other side." Plaintiff interpreted the last clause to mean that a keeper was present on the western panel, but if that was its meaning it only establishes another self-contradiction.

8

Plaintiff interprets Holmes's testimony to establish many factors in common between the 2001 and 2009 incidents. But even apart from the contradictions and general vagueness pervading his deposition, the cited excerpts generally do not sustain the meaning plaintiff attributes to them. Thus plaintiff asserts that on both occasions, the "same heavy, dragging gate discourage[ed] [an] employee from fully opening the gate." (Capitalization & italics omitted.) Conductor Holmes never said that this occurred in 2001. In the cited passage, he testified that there were times when the gate was "hard to open" in that he had to "lift up on" one leaf or the other, or both, to get them out of the way. Later he could be understood to testify that, with specific reference to the western panel—but not to any particular time—the gate would "drag[] on the concrete or asphalt" such that he had to "lift the pole on the gate in order to get it up onto the concrete." However he also insisted that when the gate was "too hard" to open, he "wouldn't go in," or "wouldn't deal with it," meaning that he "would not service the industry." This suggests that had the gate been hard to open on the occasion of the 2001 collision, he would have refused to service Frank-Lin, and the collision would not have occurred. In any event we cannot say the trial court erred in finding, as it presumptively did, that the testimony was simply too nebulous to sustain plaintiff's characterization.

Plaintiff also cites Holmes's testimony for the proposition that on both occasions the gate had the "same missing or nonfunctioning gatekeeper." (Capitalization & italics omitted.) It is true that he initially testified that "the keeper was missing because we had reported it," and that when asked if he thought it had been reported prior to the 2001 collision, he replied, "I would say yes." He also affirmed that "at least on the date of the incident involving your crew, there wasn't a keeper." As previously noted, however, he went on to indicate that the keeper was located at a point where, so far as the record shows, no keeper was ever located; and then to disclaim any memory of whether a keeper

9

was there in 2001 or not.  Again, the trial court was entitled to conclude that the testimony was simply too vague and self-contradictory to support an inference of notice.

Plaintiff asserts that the evidence showed both incidents involved deficiencies in the gate which prevented it from "providing notice that the gate was out of the foul zone." (Capitalization & italics omitted.)  We take this to mean that on both occasions there was insufficient demarcation of how far the western panel had to be opened to be in the clear.  Again, however, the cited deposition testimony fails to sustain the characterization.  First the witness was asked the somewhat nonsensical question whether "the lack of a keeper, based on information that you either learned from the brakeman or looking at what had happened involving this incident and the gate, had to do with the missing keeper[.]"  He gave the non-responsive answer, "Through my experience, most industry that had gates had keepers."  He then opined that keepers provided "a protection for us and the industry," i.e., train crews and business they serviced.  They operated, he said, to "keep the gate in place."  He then volunteered the observation that "sometimes the weight of the cars that's passing, had a tendency to move the gates."  Asked if he believed this "may have happened at Frank-Lin," he replied, "It's a possibility," adding that he had previously experienced "that vibration from a train . . . could cause a gate without a keeper to move in towards the track."  None of this testimony bears out the characterization in plaintiff's brief.  Indeed it establishes nothing whatever about the circumstances of the 2001 collision except the abstract possibility that the gate moved in response to "the weight of the cars that's passing."  That is not the purpose for which the evidence was offered.

Plaintiff cites 10 lines from the Siegmund deposition as showing that both incidents involved the "same apparent problems from lack of gatekeeper:  loose gate from either failure of gatekeeper or failure of employee's improvised security."  In the cited passage, Siegmund first testified that in describing the 2001 incident, Holmes had

10

told him "[t]hat prior to entering and servicing the facility, they opened the gate, secured them, they went in—attempted to go in, and at some point the gate freed itself and opened itself up. And there was movement, I believe, it's coming out. And as the gate swung open, it made contact with the rail cars on a reverse outward movement, thus damaging the gate itself . . . ." He also affirmed counsel's characterization that "[a]t some point Mr. Holmes was shoving cars out of the Frank-Lin facility, they ran into the right [*sic*] gate, which had somehow freed itself from where it had been secured."[7]

This testimony indeed supports an inference that the 2001 incident involved the gate "free[ing] itself from where it had been secured," as the jury presumably found had happened in the 2009 incident. But nothing in the record establishes that defendants should have attributed this occurrence to the presence of a dangerous condition. Siegmund evidently concluded that the gate "freed itself" because Holmes had neglected to adequately "secure" it. In deposition Siegmund identified a Union Pacific document entitled "Formal Conference/Training" which he had filled out, and Holmes had signed, in lieu of a formal disciplinary investigation of the 2001 incident. It described the incident as follows: "While employed as conductor on the LRM 42-29 on May 30, 2001 @ appx. 0200 while servicing customers off San Jose Industrial Lead MP157, you failed to ensure proper clearances while shoving cut of cars resulting in damage to customers gate and rail car NATX 38397. [¶] Rules discussed: 7.1 Switching safely and efficiently [¶] 7.10 Movement through Gates or Doorways." Other Union Pacific documents indicated that Siegmund had authorized payment of a claim by Frank-Lin for the costs of repairing the gate. The documents reported that Siegmund judged the claim "valid" and

---

    [7] Siegmund initially testified that it was the eastern panel that had been damaged in the 2001 incident, but on viewing a photograph of the damaged panel he agreed that it had been the western one.

11

that Holmes had signed an "Admission of Responsibility"—which probably refers to the "Formal Conference/Training" form described above.

Siegmund acknowledged that other than meeting with Holmes and reporting Frank-Lin's claim, he took no further action in response to the 2001 incident. He had manifestly concluded that the incident was the result of human error on the part of Holmes and not any defect or deficiency in the gate. Nothing in the record suggests that he should have concluded otherwise. Siegmund suggested that the gate might have been blown out of position by the wind, but he also said he might be thinking of a separate incident at another location, and in any event the stated hypothesis is wholly consistent with a conclusion that Holmes had failed to properly secure the gate. For his part, Holmes was largely unable to recall the incident itself or what he had told Siegmund about it. The natural inference to be drawn from his signature on the form described above is that he did not dispute Siegmund's evident conclusion that the incident was the result of Holmes' own neglect. Both men might have been mistaken; it may well be that deficiencies in the gate caused or contributed to that incident. But nothing in the record indicates that the incident put Union Pacific on notice of that fact.[8]

Plaintiff's entire case for admitting this evidence rests on an attempt to impose on the evidence a meaning it does not reasonably convey, i.e., that the 2001 incident arose from circumstances that should have told defendants the gate was in a condition posing an undue risk of harm to persons using it. The abstract *possibility* that this was so might indeed flow from the gate's having "freed itself" between the time Holmes had supposedly secured it and the consist's passage through it. But an abstract possibility is

---

[8] This conclusion is doubly true with respect to Frank-Lin, which—so far as this record shows—knew *nothing* about the 2001 incident except that (1) a rail car collided with its gate and (2) Union Pacific accepted responsibility for the damage. The natural inference to be drawn from this information was that the incident resulted from the fault of Union Pacific operatives.

not enough. So far as this record shows, Union Pacific concluded that the incident was the result of human error and not of any condition of the property. Given Holmes's inability to definitely recall the circumstances of the collision, it is impossible to say that Union Pacific's conclusion was unsound. We therefore cannot say that the trial court erred by excluding this evidence.

We note that the trial court adopted a second ground for excluding the evidence: that the 2001 incident was too remote in time. Plaintiff cites *People v. Hernandez* (2011) 200 Cal.App.4th 953, where the court upheld the admission of uncharged sex offenses, some of which had taken place 40 years before trial. (*Id.* at p. 968, see pp. 956-958.) Although the trial court was "most troubled" by this lapse of time, the reviewing court held it not dispositive: "the passage of time generally goes to the weight of the evidence, not its admissibility." (*Id.* at p. 968, citing *People v. Taylor* (2001) 26 Cal.4th 1155, 1173.) " 'Moreover," the court continued, "significant similarities between the prior and the charged offenses may 'balance[] out the remoteness." ' " (*Ibid*., quoting *People v. Branch* (2001) 91 Cal.App.4th 274, 285.) Here, however, the court could quite properly find the evidence too vague to establish "significant similarities" between the two incidents.

Moreover there was ample evidence that the factors bearing on these two incidents were not static, but continually changing over the eight years between them. For example, the evidence showed that a keeper was present, but apparently not functional, when plaintiff was injured in 2009. A photograph in evidence depicted what is apparently known as a "duck bill" (or "duckbill") keeper, which was intended to secure the western panel in a proper location. The photo showed the keeper embedded in the ground amidst the "ballast" or gravel along the railroad tracks.

Plaintiff faulted this keeper in at least four respects: (1) it was inadequately protected from truck traffic, and was thus vulnerable to damage; (2) it had in fact been

13

damaged, apparently by a truck's running over it; (3) by the time of the accident, it was too low for the gate to engage it; and (4) it was camouflaged by the surrounding ballast, making it inadequate as a marker of the point beyond which the gate would be clear of passing rail cars. But there was no definite evidence of how long that particular keeper had been there, or how long any of the cited conditions had been present. The original gate was apparently installed around March 2000. If the keeper was installed then, it would have been in place for only some 15 months when the 2001 collision occurred. There is no basis to find that it had already been damaged or otherwise rendered inoperative. Further, the court was told without contradiction that the gate had been repaired or modified several times between its original installation and plaintiff's injuries. One such occasion was after the 2001 collision itself, which destroyed the west leaf, necessitating its replacement. The gate was also modified in 2003, by moving one of the gate posts, apparently on order of the Public Utilities Commission. Perhaps most pertinently, it was repaired in August 2008—10 months before plaintiff was injured.

Given these various alterations, it seems improbable, or at best speculative, that any specific defect that might have contributed to the 2001 collision was still present at the time of the 2009 collision. Indeed plaintiff himself introduced evidence to the effect that relevant features of the gate were frequently, if not constantly, changing—including a succession of different keepers. Counsel asked retired conductor Lewis Gordon "how many other keepers had been installed at one point or another between the time that the gate was put up and Mr. Sidhu's injury?" He replied, "Wow, a number of them. It's like that's just one style of keeper that I've seen there. Okay. There's more than one type of keeper that's been at that gate . . . ."

As for when the keeper was rendered nonfunctional, plaintiff's counsel may have said it best in his opening statement: "We don't know when it was run over, we don't know how long it had been run over . . . ." He went on to assert, "[T]he testimony will be

14

that there was no functioning keeper on this gate for a long long time." But that is an oversimplification at best. The testimony showed a succession of keepers, none of which lasted. Presumably each of them functioned properly for a time before it was broken. All that can be reliably inferred, therefore, is that if a keeper was present at the time of the 2001 incident, it was not the same keeper as was present when plaintiff was injured eight years later, and its condition may—or may not—have been comparable.

We conclude that the trial court did not abuse its discretion by excluding the evidence concerning the 2001 occurrence.

## DISPOSITION

The judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:


_____
ELIA, J.




_____
WALSH, J.[*]




*Sidhi v. Frank-Lin Distillers, LTD*
**H038812**

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.